UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  18-cr-80160-DIMITROULEAS

UNITED STATES OF AMERICA

v.

CLAUDIA PATRICIA DIAZ GUILLEN, and
ADRIAN JOSE VELASQUEZ FIGUEROA

Defendant.

_____/

## <u>DEFENDANTS' JOINT MOTION FOR JUDGMENT OF ACQUITTAL OR A NEW TRIAL</u>

*/s/Marissel Descalzo*
**TACHE BRONIS AND DESCALZO, P.A**
150 S.E. 2nd Avenue, Suite 600
Miami, Florida 33131
Office: (305) 537-9565
Florida Bar No. 669318
Email: mdescalzo@tachebronis.com
*Counsel for Claudia Diaz Guillen*

*/s/Andrew S. Feldman*
**FELDMAN FIRM PLLC**
150 S.E. 2nd Avenue, Suite 600
Miami, Florida 33131
Direct: (305) 714-9474
Florida Bar No. 60325
Email: afeldman@feldmanpllc.com
*Counsel for Adrian Jose Velazquez Figueroa*

## INTRODUCTION

*First,* acquittal is warranted as to Counts 2, 9,[1] and 10 because there was insufficient evidence that Claudia Diaz Guillen ever performed an "official act" by signing documents authorizing the sale of UK bonds to companies controlled by Raul Gorrin.

*Second,* acquittal as to Counts 2, 9, and 10 or a new trial is warranted because it was error to instruct the jury that it could find Claudia Diaz Guillen and Adrian Velazquez Figueroa guilty of Counts 2, 9, and 10 based on FCPA violations, as the specified unlawful activity, because Raul Gorrin plainly was not a "domestic concern" under 15 U.S.C. Section 78dd-2(h)(1)(A) as a mere homeowner in Florida and there was insufficient evidence that Mr. Gorrin "corruptly" engaged in any of the necessary acts *while in territory* of the United States as required under 15 U.S.C. Section 78dd-3.

*Third,* acquittal is warranted as to Count 10 because the May 2013 transfer of Four Million dollars to Patric Love, a design company, could not *promote the carrying on of* FCPA violations or bribery in violation of Venezuela Article 197 of the Venezuela Penal Code, and Article 61 of the Venezuela Anti-Corruption Law (2003) involving Claudia Diaz Guillen where, as here, Claudia Diaz Guillen was not a public official at that time.

*Fourth*, acquittal as to Count 2 is warranted under 18 U.S.C. Section 1956(f) because there was insufficient evidence that the conduct contemplated by Section 1956(h) -- an illegal agreement - occurred in the United States as required by Section 1956(f).

*Fifth,* acquittal is warranted under *U.S. v. Christo* as to Counts 2, 9, and 10 because the government failed to prove that the money laundering offenses were separate and apart from the

---

[1] Mrs. Diaz Guillen was acquitted of Count 9 and therefore each of the arguments related to Count 9 are specific to Mr. Velazquez Figueroa.

underlying specified unlawful activities (FCPA violations and violations of Article 197 of the Venezuela Penal Code, and Article 61 of the Venezuela Anti-Corruption Law (2003).

*Sixth,* a new trial is warranted because the introduction of dozens of emails as co-conspirator statements, and their attachments, tables which consisted of inadmissible hearsay along with a summary of those tables under Rule 1006 which were not summaries of any identifiable bank account anywhere in the world were cumulative errors which were likely to affect the judgment of the jurors in rendering a fair verdict.

*Seventh*, a new trial is warranted because the court erred in prohibiting the defense from participating in the CIPA process and/or discovering or using classified information about Alejandro Andrade when such information constituted *Giglio* and *Brady* information and would have more than likely altered the outcome of the trial. Similarly, the court's failure to exclude Andrade under these circumstances mandates a new trial.

*Eighth*, a new trial is warranted because Max Camino's testimony, which included lies under oath, was likely to affect the judgment of the jurors in rendering a verdict.

## APPLICABLE RULE 29 STANDARD

Under Rule 29(a), a defendant is entitled to a judgment of acquittal when "the evidence is insufficient to sustain a conviction." See Fed. R. Crim. P. 29(a) (discussing standard for acquittal before submission to the jury). The court must "determine whether, viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *U.S. v. Grigsby,* 111 F.3d 806, 833 (11th Cir. 1997)(quotation marks omitted) (reversing conviction on appeal finding that jury verdict was

contrary to evidence). Similarly, after a verdict of guilty is rendered, a defendant may renew all arguments for judgment of acquittal or move for a judgment of acquittal. *See* Fed. R. Evid. 29(c).

### A. Acquittal is warranted as to Counts 2, 9, and 10 Because there was insufficient evidence that Mrs. Diaz Guillen performed an official act

To find Mrs. Diaz Guillen or Mr. Velazquez Figureoa guilty of each of the money laundering offenses in Counts 2, 9, and 10, the jury was required to find that Mrs. Diaz Guillen performed an official act when she signed letters authorizing the sale of UK bonds to companies controlled by Mr. Gorrin. *See* 15 U.S.C. Sections 78dd-2 and 78dd-3, Article 197 of the Venezuela Penal Code, and Article 61 of the Venezuela Anti-Corruption Law (2003). Yet, here, there was insufficient evidence that Claudia Diaz Guillen engaged in an official act by signing letters merely authorizing the sale of UK bonds to Mr. Gorrin's companies. Thus, acquittal is warranted as to Counts 2, 9, and 10.  *See. United States v. Jessica Palacio,* 21-cr-20301-GAYLES (S.D. Fla.) (granting judgment of acquittal as to conspiracy to commit wire fraud count based on lack of evidence of an agreement); *United States v. McLean*, No. 13-60068-CR-COHN/SELTZER, at *14 (S.D. Fla. Dec. 5, 2013) (granting judgment of acquittal after jury verdicts of guilty on 2 counts of bribery in violation of 18 U.S.C. Section 666 and noting that the evidence was insufficient on those counts).[2]

---

[2] *See also U.S. v. Bernal-Bernitez*, No. 07-20563-CR-GRAHAM, at *11-12 (S.D. Fla. Dec. 20, 2007) (granting judgment of acquittal on conspiracy charge and emphasizing that "[s]imply put, there was not enough evidence presented at trial to demonstrate that a reasonable jury could conclude that Santibanez conspired with the other Defendants to possess cocaine or otherwise attempted to possess cocaine himself."); *United States v. Larry Masino, et al*., 16-cr-17- MGC (N.D. Fla. Nov. 2, 2018) (Dkt. 182) (entering a judgment of acquittal on the wire fraud count finding insufficient evidence at trial); *U.S. v. Peterson*, Criminal Action No. 7:07-CR-22-HL, at *17 (M.D. Ga. Nov. 3, 2008) (granting judgment of acquittal on false statement count); *United States v. Hough*, 2:13-cr-72-FtM-29DNF, at *2 (M.D. Fla. Feb. 21, 2014) (granting judgment of acquittal as to false statement in tax return count).

The approval of the bond sale, in this instance, was purely ministerial, in nature. Other departments at the *Oficina Nacional de Tesoreria* selected and identified bonds to sell or auction at the official rate to institutional investors and companies and they passed along the recommendation to Mrs. Diaz Guillen to sign. A bond was then made available for sale by *Oficina Nacional de Tesoreria*, an offer was made to purchase a bond, and the offer was accepted. Yet, Mrs. Diaz Guillen did not finally approve the sale of the bond. Instead, Mr. Giordani, the minister of Finance, and President Hugo Chavez did. As such, none of this conduct qualifies as an "official act."

In addition, the verdict is contrary to the court's instructions concerning an "official act." The jurors were instructed:

> To qualify as an "official act," the public official must have made a decision or taken an action or agreed to make a decision or take an action on *a question, matter, cause, suit, proceeding, or controversy*. Further, the question, matter, cause, suit, proceeding, or controversy must involve the formal exercise of governmental power. It must be similar in nature to a *lawsuit before a court, a determination before an agency, or a hearing before a committee*

*See* Dkt. No. 311 at 28 (Court's Instructions), citing *United States v. McDonnell*, 136 S. Ct. 2355, 2368 (2016)

The approval of a bond involves the exercise of government authority. Yet nothing about approving the sale of a UK bond involves a question, matter, cause, suit, proceeding, or controversy. Nor does that decision resemble a lawsuit before a court, a determination before an agency, or a hearing before a committee.

Furthermore, signing off on a letter ghost-written by others at the ONT for a bond sale is not the same as authorizing a change in the official rate for the benefit of the purchaser. Here, there was no evidence that Mrs. Diaz Guillen authorized or could authorize a change to the official rate. Nor was there evidence that Mrs. Diaz Guillen controlled the rate. And, the approval of a bond

sale is in no way similar to the awarding of a government contract which offers exclusivity to the beneficiary of the contract. *U.S. v. Smith*, 429 F. App'x 840, 845 (11th Cir. 2011) (affirming conviction for bribery of public official where official act was awarding of government contract). Instead, the evidence at trial was that anyone with the financial means to do so could purchase a UK bond at the official rate.

For each of these reasons, acquittal is warranted as to Counts 2, 9, and 10.

**B. Acquittal or a new trial is Warranted as to Counts 2, 9, and 10 Because it was error to instruct the jury that they Could Find Mr. Velazquez Figueroa or Claudia Diaz Guillen Guilty of the charged Offenses based on violations of the FCPA as a specified unlawful activity.**

District courts "have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts." *United States v. Arias*, 984 F.2d 1139, 1143 (11th Cir. 1993) (internal quotation marks omitted). *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (internal citations omitted) ("[W]e will not reverse a conviction on the basis of a jury charge unless the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process."). Here, because it was error to instruct that they could find Mrs. Diaz Guillen or Mr. Velazquez Figueroa of the charged money laundering offenses in Counts 2, 9, and 10 based on the specified unlawful activity of violating the FCPA, Counts 2, 9, and 10, judgment of acquittal or a new trial is warranted.

*1.  FCPA Liability Must be Based on One of Three Enumerated Statutory Categories*

Congress imposed important jurisdictional limitations which preclude the Government from prosecuting certain classes of persons, including non-resident foreign nationals unless they fall within one of three categories delineated in the statute, an issuer, a domestic concern or its agents, and a third category of persons who commit specific prohibited conduct while in the United States. *See* 15 U.S.C. Section 78dd-1, *et seq*. Similarly, a defendant who does not fall into one of

these enumerated categories cannot aid and abet or conspire with one of his supposed co-conspirators even if that co-conspirator is an issuer, domestic concern, or committed specified conduct while in the territory of the United States. *U.S. v. Hoskins,* 902 F.3d 69, 83-84 (2d Cir. 2018) (*Hoskins II)* (reversing FCPA conviction)*; United States v. Hoskins,* 73 F.Supp.3d 154, 165 (*Hoskins I)* (dismissing FCPA indictment based on this principle and lack of extraterritorial jurisdiction); *see also United States v. Hoskin*s, 123 Supp.3d 316-17 (D. Conn. 2015) (affirmed by *Hoskins*, c*iting Gebardi v. United States*, 287 U.S. 112 (1932) ("where Congress chooses to exclude a class of individuals from liability under a statute, the Executive may not override the Congressional intent not to prosecute that party by charging it with conspiring to violate a statute that it could not directly violate."); *United States v. Castle,* 925 F.2d 831, 832, 835 (5th Cir. 1991) (finding that persons that cannot be prosecuted under the FCPA itself, may not be prosecuted under the general conspiracy statute for conspiring to violate the Act" and reinforcing that Congress wanted to avoid the "'inherent jurisdictional enforcement, and diplomatic difficulties' raised by the application of the [FCPA] to non-citizens . . . ")

Against this backdrop, the Superseding Indictment alleges, in Count One, FCPA violations based on two distinct theories. ***First,*** that Raul Gorrin was a "domestic concern" under 15 U.S.C. Sections 78dd-2(a) and 78dd-2(h)(1) because he was a "resident of the United States having maintained a residence in the United States." *See* Dkt. No. 44 at 2. ***Second,*** that Raul Gorrin corruptly used the mails or interstate commerce in furtherance of bribing foreign Claudia Diaz Guillen *while in the territory of* the United States or that Raul Gorrin corruptly engaged in acts in furtherance of bribing foreign Claudia Diaz Guillen *while in the territory of* the United States as

set forth in 15 U.S.C. Section 78dd-3. [3] *See* Dkt. No. 44 at 7-8. the

Under either FCPA theory, the government does not allege that Mrs. Diaz, Mrs. Guillen, Mr. Andrade, and Mr. Jimenez-Aray fall into any of the enumerated categories of the FCPA. Instead, it alleges that Mrs. Diaz, Mrs. Figueroa, Mr. Andrade, Mr. Jimenez-Aray, and Mr. Gorrin, were nationals and citizens of Venezuela. Dkt. No. 44 at 2-3. Nor does it allege that any of those persons – other than Mr. Gorrin -- conspired, aided and abetted, or committed a violation of the FCPA.

### 2. *Mr. Gorrin Cannot be a Domestic Concern as a Mere Homeowner*

Applying these principles here, as a matter of law, Mr. Gorrin's status as a homeowner in Florida cannot convert him into a domestic concern under 15 U.S.C. Section 78dd-2(h)(1)(A). As with all issues of statutory construction, "we begin with the language of the statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). Our first step "'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Id.* (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997)). We "proceed from the understanding that '[u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'" *Sebelius v. Cloer,* 133 S.Ct. 1886, 1893 (2013). Nonetheless, courts should not "construe the statutory meaning of a term in a vacuum." *Tyler v. Cain,* 533 U.S. 656. 662 (2001). Nor should courts engage in interpretations of statutes that render

---

[3] Any person ….***while in the territory of the United States, corruptly*** to make use of the mails or any means or instrumentality of interstate commerce or to do any other act in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to …. any foreign official, any foreign political party, political candidate for foreign political office, or any person knowing that a portion of such money of thing or value will be given to the above referenced persons for purposes of accomplishing any of the objectives set forth in Section 78dd-3(a)(1)-(3). *See* **15 U.S.C. Section 78dd-3.**

language superfluous. *Connecticut Natl Bank v. Germain*, 503 U.S. 249, 253 (1992); *see also United States v. Canalis-Jimenez*, 943 F.2d 1284, 1287 (11th Cir. 1991) (a statute should be interpreted so that no words shall be discarded as meaningless, redundant, or mere surplusage).

Here, a domestic concern is defined as any ***individual who is a citizen, national, or resident of the United States.*** *See* 15 U.S.C. Section 78dd-2(h)(1)(A). The plain meaning of the word "reside" belies any premise that the mere maintenance of a residence in Coral Gables converts a non-citizen, a national of a foreign country, and a person who possesses no legal resident status (as a permanent resident or otherwise) into a "resident of the United States" under the FCPA. *See* Miriam Webster's Dictionary (2022 ed.) ("**to reside**" means "to dwell permanently of continuously; occupy a place as one's legal domicile")[4]; *see* Oxford English Dictionary (2022 ed.) ("**to reside**" means "to dwell permanently or for a considerable time, to have one's settled or usual home *in* or *at* a particular place. Also in extended use.").[5]Each of these definitions contemplate permanent occupation, a permanent dwelling, or something akin to it. The allegation that Mr. Gorrin, a Venezuelan national and citizen, merely "maintained" a residence in Coral Gables is a far cry from alleging that Mr. Gorrin established a permanent home in Florida, occupied Florida as his legal domicile, or dwelled in that location [Coral Gables, Florida] permanently or continuously.

And, this point is further illustrated when you consider the syntax and the context in which the term "***resident of the United States***" is used in Section 78dd-2(h)(1)(A). *United States v. DBB Inc*., 180 F. 3d 1277, 1281 (11th Cir. 1999) (in reading a statute we construe it as a whole and avoid "looking at one word or term in isolation."); *Deal v United States,* 508 U.S. 129, 132 (1993)

---

[4] https://www.merriam-webster.com/dictionary/reside

[5] https://www.oed.com/view/Entry/163557#eid25944880

(observing that the meaning of a statutory term should not be "determined in isolation" but instead "must be drawn from the context in which it is used"); *see also Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961) ("Under the familiar interpretive canon *noscitur a sociis,* "a word is known by the company it keeps." . That Section includes three terms: **national, citizen, and resident of the United States.** The terms national or citizen connote a permanent or continuous occupation or presence in the United States

Beyond this, nowhere in the plain text of the statute does the FCPA permit jurisdiction based on mere home ownership in Florida. Nor has the undersigned encountered a single judicial decision in any U.S. district which holds that a homeowner who is a national and citizen of another country and is not a legal or permanent resident of the United States is a "resident of the United States" pursuant to 15 U.S.C. Section 78dd-2(h)(1)(A). *United States v. Esquenazi*, 752 F.3d 912, 920 (11th Cir. 2014) ("The FCPA does not define the term "instrumentality," and this Court has not either. For that matter, we know of no other court of appeals who has. The definition matters in this case, in light of the challenges to the district court's jury instructions on "instrumentality"; to the sufficiency of the evidence that Teleco qualified as an instrumentality of the Haitian government; and to Mr. Esquenazi's contention that the statute is unconstitutionally vague."); *But compare United States v. Harder*, 168 F. Supp. 3d 732, 738 (E.D. Pa. 2016) (emphasis added) ("Defendant, a ***United States permanent resident***, is plainly a domestic concern. Id.§ 78dd–2(h)(1) (defining a "domestic concern" as, *inter alia*, a U.S. resident)."); *See also Ahmed v. Magan,* Civil Action 2:10-cv-00342, at *3 (S.D. Ohio Aug. 20, 2013) ("I also find that as a permanent resident of the United States, the presumption of against extraterritoriality has been overcome in this case.").

Finally, residency in the United States is determined by federal law. For example, permanent residency or legal residency in the United States are governed by Title 8 and federal immigration laws. Similarly, under the tax code, a non-U.S. citizen may only qualify as a *U.S. resident alien* if they satisfy the green card test (*i.e.* they have a green card) or the substantial presence test (presence in the U.S. for **330 days** or more in one year). *See* 26 U.S.C. Section 7701(b)(1)(A)-(B) (Definitions); *see also* 26 U.S.C. Section 7701(a) (stating that these definitions apply "[w]hen used in this title [Title 26], where not otherwise distinctly expressed or manifestly incompatible with the intent thereof-/.."). Thus, the government's proposed definition of "resident" would lead to an absurdity where, as here, Congress has never expressed any intent to award persons with the status as "U.S. residents" under federal law merely based on home ownership. To the contrary, as shown, the plain meaning of the word "reside" combined with federal laws governing U.S. residency plainly contemplate permanent occupation and not mere home ownership.

3.  *There was Insufficient Evidence of Any Corrupt Acts Committed by Mr. Gorrin in Furtherance of the Charged Offenses (Counts 2, 9, and 10) While in the Territory of the United States*

There was insufficient evidence at trial that Mr. Gorrin committed any corrupt acts in furtherance of the charged offenses (Counts 2, 9, and 10) while in the territory of the United States.[6]

The only three government witnesses at trial that had any substantive communication with Mr. Gorrin were Mr. Andrade, Mr. Brakha, and Mr. Singh. Neither Mr. Brakha nor Mr. Singh testified about any corrupt acts or communications performed by Mr. Gorrin while Mr. Gorrin was physically present in the United States. To the contrary, both witnesses disavowed having any

---

[6] Equally as compelling, the government failed to prove any of the factual allegations included in paragraphs 27a-g of the Superseding Indictment relating to this territorial prong at trial. *See* Dkt. No. 44 at 9-10.

knowledge about any wrongful conduct involving Mr. Gorrin. Likewise, Mr. Andrade never testified about any acts or communications performed by Mr. Gorrin while Mr. Gorrin was physically present in the United States. The closest Andrade came to testifying about any U.S. acts or meetings with Gorrin was the following testimony:

> Q. And where would you meet Raul Gorrin?
> A. At my house.
> Q. Okay. Did you ever go to Raul Gorrin's house?
> A. Yes. On one occasion, I did go to his house.
> Q. What were you discussing with Raul Gorrin during these occasions?
> A. ***Many -- many things***.

Trial Testimony of Alejandro Andrade, at 196: 15-25 (November 29, 2022)

On its face, such testimony does not implicate Mr. Gorrin in any illegal agreement or conduct while Mr. Gorrin was in the territory of the United States.

Moreover, while the government introduced emails and bank transactions (wire transfers) at trial, there was no evidence adduced at trial that Mr. Gorrin executed bank transactions or wires *or* sent emails or any other communications while he was in the territory of the United States. [7]

For these reasons, the court improperly instructed the jurors that they could find Mrs. Diaz Guillen or Mr. Velazquez Figueroa guilty of the charged offenses based on the predicate specified unlawful activity of violating the FCPA when Mr. Gorrin cannot, as a matter of law, be a domestic concern as a mere homeowner in Florida and when there was insufficient evidence that Mr. Gorrin "corruptly" engaged in any of the necessary acts *while in territory* of the United States as required under 15 U.S.C. Section 78dd-3.

---

[7] And, testimony at trial showed that many of the emails from "asesor" 1, 2, and 3 or Mrs. Gouveia originated in Venezuela. In fact, the government admitted that these persons were supposed "agents" of Mr. Gorrin working for his benefit in Venezuela.

**C. Acquittal is Warranted as to Count 2 under 18 U.S.C. Section 1956(f) Because There was Insufficient Evidence of the Conduct Contemplated by 18 U.S.C. Section 1956(h) – an Illegal Agreement – which Occurred in the United States as required by Section 1956(f)**

Acquittal is warranted as to Count 2 under 18 U.S.C. Section 1956(f) because there was insufficient evidence of the conduct contemplated by 18 U.S.C Section 1956(h) – an illegal agreement --which occurred in the United States as required by the plain language of Section 1956(f).

Section 1956(f) contains an extraterritorial provision which only applies extraterritorially to non-U.S. citizens like the Defendants for conduct that occurs in part in the United States:

> (f) There is extraterritorial jurisdiction over the conduct prohibited by this section if-
> (1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and
>
> (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.4

*See* 18 U.S.C. § 1956(f)(emphasis added)

Here, the "conduct" in Count Two which is prohibited by Section 1956 is Section 1956(h), which states "[a]ny person who ***conspires to commit any offense defined in this section*** or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." Therefore, the conduct required to violate Section 1956(h) is defendant's agreement because the *sine qua non* of a conspiracy is an agreement. *See Whitfield v. United States*, 543 U.S. 209 (2005) (holding that money laundering conspiracy does not require an overt act but does require an agreement); *Iannelli v. United States*, 420 U.S. 770, 777, (1975) ("Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.").

In addition, the plain language of these words amply supports this point. "Conspire" means "to join in a secret agreement to do an unlawful or wrongful act or an act which becomes unlawful as a result of the secret agreement." *see also* Merriam Webster Dictionary (2022 ed.).[8] Likewise, to "occur" is "to come into existence." *See* Merriam Websters Dictionary (2022 ed.)[9]

There was no evidence at trial that Mrs. Diaz Guillen or Mr. Velazquez Figueroa entered into an agreement with each other, Raul Gorrin, or Alejandro Andrade which came into existence or *occurred* in the United States. *See U.S. v. Lopez-Vanegas*, 493 F.3d 1305, 1313 (11th Cir. 2007) (vacating drug conspiracy conviction under Section 846 finding that the statute did not apply extraterritorially to a conspiracy to traffic drugs where objective of conspiracy was to distribute drugs from South America to Europe even though many meetings took place in the United States in furtherance of the international distribution.). [10]

Instead, two witnesses testified at trial regarding any such conduct, Maximiliano Camino and Alejandro Andrade. Yet, Mr. Andrade never testified about any agreement which came into

---

[8] https://www.merriam-webster.com/dictionary/conspire?utm_campaign=sd&utm_medium=serp&utm_source=jsonld

[9] https://www.merriam-webster.com/dictionary/occur

[10] *See e.g. U.S. v. Daisy Rafoi*, et al, 17- cr-00514 (S.D. Tex) (Dkt. No. 255 entered 11/12/21) (dismissing money laundering charges in Indictment on this basis); *United States v. Nervis Gerardo Villalobos-Cadenas,* 17-cr-00514 (S.D. Tex.) (Dkt. No. 261 entered 2/8/22) (motion to dismiss pending on same basis); U.S. v. Hoskins, 902 F.3d 69 (2d Cir. 2018) (*Hoskins II*) (reversing FCPA conviction); *United States v. Hoskins*, 73 F.Supp.3d 154, 165 (*Hoskins I*) (dismissing FCPA indictment based on lack of extraterritorial jurisdiction); *United States v. Vilar*, Nos. 10-521-cr(L), 10-580- cr-(CON), 10- 512 4639-cr(CON), 2013 WL 4608948 (2d Cir. Aug. 30, 2013) (finding "the general rule is that the presumption against extraterritoriality applies to criminal statutes, and section 10(b) is no exception"); *United States v. Delgado-Garcia*, 374 F. 3d 1337 (D.C. Cir. 2004) (applying presumption in alien smuggling prosecution where there are "sensible contextual linguistic reasons for reading the plain texts of domestic statutes not to apply everywhere in the world").

existence in the United States *or* which he entered into with either Mrs. Diaz Guillen or Mr.

Velazquez Figueroa or Raul Gorrin in the United States. To the contrary, his testimony was limited

to the following discussions in the U.S. with Raul Gorrin:

> Q: Okay. How many properties did Raul Gorrin have in the State of
> Florida at that time as well?
> A. No, no, I do not recall how many.
> Q. At least one?
> A. At least one, yeah.
> Q. And where would you meet Raul Gorrin?
> A. At my house.
> Q. Okay. Did you ever go to Raul Gorrin's house?
> A. Yes. On one occasion, I did go to his house.
> Q. What were you discussing with Raul Gorrin during these occasions?
> A. ***Many -- many things***.

Trial Testimony of Alejandro Andrade, at 196: 15-25 (November 29, 2022) (emphasis added)

The discussion of "many many things" is not evidence of a conspiracy or any unlawful

agreement which "occurred" in the United States.

Likewise, the conversations Andrade supposedly had with Claudia Diaz Guillen in

Venezuela on his "official phone" did not occur in the U.S. *See* Trial Testimony of Alejandro

Andrade, at 274:23-15, 275:1-2 (November 29, 2022) (testifying "No. I don't remember if I still

kept that phone when I came and went [to the U.S.], but when I did talk to her, I did have it then.").

Instead, those conversations supposedly occurred in Venezuela when Mr. Andrade supposedly still

had access to his official phone. *See id.* at 274-276. And, Mr. Andrade testified that during the

conversations he had with Mrs. Diaz Guillen he did not communicate a bribe:

> Q. No. I just want to clarify that you don't communicate -- you didn't
> communicate the bribe or wanting for her to be bribed clearly -- in clear
> terms; is that what you're testifying to?
> A. Of course I didn't try that.

*Id.* at 282:22-24.

And, there was no evidence of any communications or interactions between Mr. Andrade and Mr. Velazquez Figueroa in the United States. Mr. Andrade could not even identify Mr. Velazquez Figueroa in the courtroom. *See* Trial Testimony of Alejandro Andrade at 132:10-11 (November 28, 2022) ("I saw him very little on the time that I dealt with him, and I don't recognize him."). When asked about his communications or interactions with Mr. Velazquez Figueroa anywhere in the world, Mr. Andrade never testified as to having any specific conversation with Mr. Velazquez anywhere in the United States. Indeed, he testified repeatedly that his interactions with Mr. Velazquez were limited to occasions where he saw him at the Miraflores Palace in Venezuela and on "government matters":

> Q. Okay. **When did you first meet Adrian Velasquez?**
> A. I don't remember the first time that I saw him. I do know that I saw him. **I remember that I saw him, and it had to do with government matters over there in the palace as well.**

*See* Transcript of Alejandro Andrade, 198:20-25 (November 28, 2022) (emphasis added)

> Q. You barely know Mr. Velasquez Figueroa; right?
> A. Yes. *I saw him few times.*

*See* Transcript of Alejandro Andrade, 328:8-10 (November 29, 2022) (emphasis added)
> Q. So again, Adrian -- Mr. Velasquez Figueroa, my client, is basically a stranger to you; fair statement?
>
> A. Not -- not so much -- not as much as a stranger *per se* because *I've seen him many times at the palace, at the government palace, but I do not recall any details as so far as to sharing or socializing with him*.

*See* Transcript of Alejandro Andrade, 330:10-17 (November 29,2022) (emphasis added)

Similarly, Mr. Camino's testimony about any supposed agreement entered into in the United States was limited to his testimony that Mr. Velazquez Figueroa supposedly told him – outside the presence of Mrs. Diaz Guillen -- that he and Mrs. Diaz Guillen had met with Alejandro

Andrade in Wellington, Florida and had discussed how Mrs. Diaz Guillen would become treasurer of Venezuela:

> Q. Did Mr. Velasquez say why they were going to Wellington, Florida, to meet Alejandro Andrade?
> A. ***To make sure that Claudia would become national treasurer.***

See Trial Testimony of Max Camino, at 1029:5-8 (December 2, 2022)

Mr. Camino continued:

> Q. And did you have any conversations with either one of them when they came back?
> A. With Mr. Velasquez.
> Q. And what did Mr. Velasquez tell you after he
> came back from that meeting, the purported meeting in Wellington with Mr. Andrade?
> A. ***Everything went well and that shortly Mrs. Claudia would be named national treasurer. She had Mr. Andrade's blessing and he was going to help out.***
> Q. And did Defendant Velasquez mention Mr. Gorrin in any way to you after your trip to Wellington?
> A. ***He's the one who brokered the meeting***?

See Trial Testimony of Max Camino, at 1029:23-25, 1030:1-10 (December 2, 2022).

Even construed in the light most favorable to the government, that testimony is not evidence of any illegal agreement, as charged in Count 2, which occurred in the United States. It is testimony (from a witness who perjured himself) that Mr. Velazquez told Mr. Camino that Adrian and Claudia met with Andrade to assure that Claudia became treasurer of Venezuela and that the meeting was brokered by Mr. Gorrin. Absent from this testimony is any reference to the sale of bonds, or any agreement to sell bonds to Gorrin or his companies, or any reference to any agreement for Claudia Diaz Guillen to perform any official act at any time to benefit Gorrin. Finally, the absence of any testimony from Mr. Andrade that there was any such meeting with Claudia or Adrian at his house in Wellington, Florida further supports acquittal on this basis.[11]

---

[11] The government had every opportunity to address this on re-direct examination of Andrade but chose not to do so.

For each of these reasons, acquittal on Count 2 is warranted.

**D.  Judgment of Acquittal is Warranted as to Count 10 Because, as a Matter of Law, the May 2013 Wire of Four Million Dollars to Patric Love Could Not Promote the *Carrying on* of FCPA violations or Venezuela Bribery Laws Involving Claudia Diaz Guillen Where, as Here, Claudia Diaz Guillen Was No Longer a Public Official at the time of the transfer.**

The guilty verdicts as to Count 10 must be vacated because as a matter of law the Four-million-dollar wire transfer on **May 17, 2013** from Andiron corporation's Swiss bank account to the Citibank account of Patric Love could not promote the *carrying on* of FCPA violations or violations of Article 197 of the Venezuela Penal Code, and Article 61 of the Venezuela Anti-Corruption Law (2003) involving Mrs. Diaz Guillen when Mrs. Diaz Guillen was no longer a public official.

Once President Hugo Chavez died on **March 5, 2013,** Mrs. Claudia Diaz duties as treasurer of Venezuela were limited**.**  By no later than **April 17, 2013**, Mrs. Diaz Guillen was no longer treasurer of Venezuela as illustrated by Mrs. Diaz Guillen's *Acta de Entrega*. *See* DX 10 and 10A (*Acta de Entrega.* Claudia Diaz Guillen); *see also* Testimony of Claudia Diaz Guillen, at 2247:13-18 (December 9, 2022) (testifying that she resigned as treasurer in April of 2013).

On **May 17, 2013**, *after* Mrs. Claudia Diaz Guillen was no longer treasurer of Venezuela, Andiron corporation sent a wire transfer of approximately Four Million dollars to the Citibank account of Patric Love Holdings ending in 1447. *See* GX 1113 (**shown below**)

| | | | | |
|---|---|---|---|---|
| PATRIC LOVE HOLDINGS, INC. | | Account        1447        Page 3 of 6 Statement Period: May 1 - May 31, 2013 | | |

**CHECKING ACTIVITY**                                     *Continued*

| Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 05/14 | DEBIT CARD PURCH Card Ending in 0870<br>BNJVSPGF           0870 May 14 | 22.95 | | 5,399.35 |
| 05/14 | DEBIT CARD PURCH Card Ending in 0870<br>STARBUCKS MERCU 2261089 MIA   FL 13131 | 25.00 | | 5,374.35 |
| 05/14 | DEBIT CARD PURCH Card Ending in 0870<br>JYSG2AWU | 25.00 | | 5,349.35 |
| 05/14 | DEBIT CARD PURCH Card Ending in 0870<br>USAIRWAYS07231298420870 MIA   FL 13131 | 25.00 | | 5,349.35 |
| 05/14 | DEBIT CARD PURCH Card Ending in 0870<br>USAIRWAYS07231298036145 MIA   FL 13131 | 30.00 | | 5,319.35 |
| 05/14 | DEBIT CARD PURCH Card Ending in 0870<br>R9GP2MYI            0870 May 14 | 65.97 | | 5,253.38 |
| 05/14 | BEVERLY HILLS U.S. MAI BEVRLY HILLS CA 13131<br>E250BSKX             0870 May 14 | 81.63 | | 5,171.75 |
| 05/14 | DEBIT CARD PURCH Card Ending in 0870<br>RELAIS DE PARIS      SANA BARBARA CA 13133 | 92.98 | | 5,078.77 |
| 05/14 | DEBIT CARD PURCH Card Ending in 0870<br>VIGLUCCI'S SEAFOOD & CARSBAD   CA 13133 | | | |
| 05/14 | DEBIT CARD PURCH Card Ending in 0870<br>*YXKZ*10 | 190.00 | | 4,888.77 |
| 05/14 | LEGALZOOM.COM        8007730688  CA 13131 | | | |
| 05/14 | DEBIT CARD PURCH Card Ending in 0870<br>HWNTJCT6             0870 May 15 | 511.75 | | 4,377.02 |
| 05/14 | AMERICANAIR237697420701 DALLAS   TX 13133 | | | |
| 05/14 | DEBIT CARD PURCH Card Ending in 0870<br>GMY4SZYZ             0870 May 15 | | 0.19 | 4,377.21 |
| 05/15 | VICEROY SEASIDE SAN   SANA MONICA CA 13133<br>ELECTRONIC CREDIT | | | 4,377.21 |
| 05/15 | PAYPAL               VERIFYBANK 2042J22222D77LHL May 15 | | 0.20 | 4,377.41 |
| 05/15 | ELECTRONIC CREDIT | | | 4,377.41 |
| 05/15 | PAYPAL               VERIFYBANK 1042J22222D77LHL May 15 | 178.18 | | 4,199.23 |
| 05/15 | DEBIT CARD PURCH Card Ending in 0870<br>54MHKSYZ            0870 May 15 | | | |
| 05/15 | AYRES HOTEL MANHAT   HAWR/ORNE   CA 13134 | 0.39 | | 4,198.84 |
| 05/15 | ACH DEBIT<br>PAYPAL               VERIFYBANK 4042J22222D77LHL May 15 | 172.93 | | 4,025.91 |
| 05/16 | DEBIT CARD PURCH Card Ending in 0870<br>HPA 815-633-5800  INS.PREM   HSX1120206   May 15 | 77.10 | | 3,948.81 |
| 05/16 | DEBIT CARD PURCH Card Ending in 0870<br>RY9H6DYE             0870 May 16 | | | |
| 05/16 | DELPHINE             HOLYWOOD   CA 13135 | 79.69 | | 3,869.12 |
| 05/16 | DEBIT CARD PURCH Card Ending in 0870<br>GLLGD00              0870 May 16 | | | |
| 05/16 | LE PETIT FOUR       LOSANGELES  CA 13135 | 111.90 | | 3,757.22 |
| 05/16 | DEBIT CARD PURCH Card Ending in 0870<br>6FS2ZY3Z             0870 May 17 | | | |
| 05/16 | CHEESECAKE LOS ANGELES LOSANGELES CA 13135 | | | |
| 05/17 | FUNDS TRANSFER<br>WIRE FROM 1 UNIO  ON CORPORA'ON S.A.       May 17 | | 3,999,975.00 | 4,003,732.22 |
| 05/17 | DEBIT CARD PURCH Card Ending in 0870<br>GNJVSPGF            0870 May 17 | 11.99 | | 4,003,720.23 |
| 05/17 | T4 STARBUCKS MS257139H LOSANGELES  CA 13136 | | | |
| 05/17 | DEBIT CARD PURCH Card Ending in 0870 | 29.10 | | 4,003,691.13 |

Mercedes Matsuo testified about the purpose of this transfer:

> Q. Okay. So the $4 million that was received was -- you expected -- you're expecting this $4 million because that was the amount of money that was going to be used to promote the activities of Patric Love; right?
> A. Yes.
> Q. It was going to be used to promote the ability for the business to carry on as a fashion and design business; right?
> A. Yes.

*See* Testimony of Mercedes Matsuo, 1953: 17-25 (December 8, 2022)

> Q. To the best of your knowledge, none of these monies were being -- going to be received to promote any type of illegal activity; right?
> A. No, sir.
> Q. Because this money, as you -- when you expected to receive it, it was going to be used to do things like
> hire models for a fashion shoots; right?
> A. Yes.
> Q. It was going to be used to pay for expenses as they became due, right?
> A. Correct.
> Q. It was going to be used to finance potential business trips to look for things like fabric and clothes and other types of materials to create designs; right?
> A. Yes.

*See* Testimony of Mercedes Matsuo, 1954: 1-16 (December 8, 2022)

Mrs. Matsuo's testimony was further supported by expenses contained in GX 1113 which included hiring models and fashion designers as shown below:

In a similar context, in *United States v. Leak*, 426 F. Supp. 3d 206, 213-14 (W.D.N.C. 2019) a case involving the supposed laundering of kickbacks to promote recruitment of college athletes, the court directly addressed the plain language of the promotional money laundering statute:

> The ordinary meaning of "carry on" was "conduct, manage *and "to continue one's course of activity."* <u>Id.</u> It would be implausible to interpret "to promote the carrying on of specified unlawful activity" as "to launch the conducting or management of specified unlawful activity." ***Thus, the ordinary meaning of "carry on" suggests that in this context, "promote" means to further or encourage, rather than to launch***. Applying the ordinary meaning of "promote" and "carry on," the plain language of the PML statute makes it unlawful to conduct a transaction that involves the proceeds of specified unlawful activity with the intent to further or encourage the conducting of specified unlawful activity. ***The plain meaning of the PML statute therefore presupposes specified unlawful activity that was ongoing at the time of the money laundering activity. To read it otherwise would read the phrase "the carrying on" out of the statute***

*United States v. Leak*, 426 F. Supp. 3d 206, 213-14 (W.D.N.C. 2019)

The court continued:

> ***Read together, "promote" and "the carrying on" require continuation.*** It would be arbitrary to interpret the PML statute as prohibiting transactions intended to promote any

specified unlawful activity that began prior to the money laundering activity—even specified unlawful activity that did not generate the laundered proceeds—but not as prohibiting transactions intended to promote newly instigated specified unlawful activity. The better contextual interpretation of the PML statute is that it prohibits transactions involving proceeds of specified unlawful activity with the intent to promote the carrying on of generating specified unlawful activity from which the proceeds were derived.

*United States v. Leak*, 426 F. Supp. 3d 206, 214 (W.D.N.C. 2019).

In the instant case, applying the court's textual interpretation of the promotional money laundering statute in *Leak* compels the conclusion that an acquittal is warranted as to Count 10. *Leak*, 426 F. Supp. 3d at 213-214. [12]

First, the Four-Million-dollar wire transfer to Patric Love could not launch or encourage the "carrying on" of bribes or things of value to Claudia Diaz Guillen in her capacity as a foreign public official to obtain and retain business for Mr. Gorrin in violation of the FCPA. *Leak*, at 213-214. Second, that transfer could not launch or encourage the "carrying on" of Mrs. Diaz Guillen's receipt or acceptance of any monies in exchange for any act relative to her duties as treasurer as set forth in Article 197 of the Venezuela Penal Code. *Id.* at 213-14. And, third, the wire transfer to Patric Love could not launch or encourage the "carrying on" of Mrs. Diaz Guillen's acceptance or receipt of "undue payments" in exchange for some act relative to her duties as treasurer as set forth in Article 61 of the Venezuela Anti-Corruption Law (2003). *Id.*

In addition to *Leaks*, decisions from this Circuit and other Courts of Appeals illustrate that the monies must promote the specified unlawful activity. *See e.g. United States v. Calderon*, 169 F.3d 718, 722 (11th Cir. 1999) (reversing conviction for promotional money laundering finding

---

[12] The government cannot deny that a necessary participant in any ongoing scheme in violation of Article 61 of the Venezuela Anti-Corruption Law (2003) and Article 197 of the Venezuela Penal Code or any scheme involving violations of the FCPA is a public official. It is judicially noticeable that both Mrs. Diaz Guillen and Mr. Andrade were no longer public officials on May 17, 2013.

that there was insufficient evidence of an intent to promote the carrying on of drug activity where defendant dropped off cash for an undercover agent that had been requested by a CI working with drug traffickers which was transferred by the DEA agent to the account in furtherance of supposed drug trafficking reasoning that there was no evidence indicating how the money was to be spent or how it furthered the underlying drug activity); *U.S. v. Jackson*, 935 F.2d 832, 841 (7th Cir. 1991) ("We are, however, unable to view the mobile phone purchases that comprise the remainder of count 3, the rental payments alleged in count 4, or the checks written to cash charged in count 5 as intended to promote the continued operations of Davis' continuing criminal enterprise under § 1956(a)(1)(A)(i). The government did not prove that the cellular phones played the same role — or indeed, any role — in Davis' drug operations as the beepers. Likewise the rental payments and the checks written to cash; certainly these expenditures maintained Davis' lifestyle, but more than this is needed to establish that they promoted his drug activities."); *U.S. v. Heaps*, 39 F.3d 479, 486 (4th Cir. 1994) ("we must respectfully disagree that the mere receipt of a money transfer and the subsequent placement of cash in a box can, of itself, constitute money laundering under the statute. A holding by the Seventh Circuit, *United States v. Jackson,* 935 F.2d 832 (7th Cir. 1991), is squarely consistent with our holding here. In the instant case, in the court below, the prosecution argued that the defendant could have used the funds to "turn around and buy more drugs," thereby promoting drug dealing"); *U.S. v. Trejo*, 610 F.3d 308, 314, 318 (5th Cir. 2010) (analyzing Section 1956(a)(2)(A)(i) and finding that defendant's conduct did not amount to promotion money laundering and further noting that "the evidence must show that the defendant's conduct not only promoted a specified unlawful activity but that he engaged in it *with the intent* to further the progress of that activity").

Here, based on the uncontradicted testimony of Mrs. Matsuo it is undeniable that the transfer from Andiron Corporation to Patric Love was used to promote the carrying on of a fashion design company which included, among other things, purchasing cloth, hiring designers, business travel, and retaining models. *See* Testimony of Mercedes Matsuo, at 1953-1954: 17-25 (December 8, 2022); *see also* GX 1113; GX 1110 (including more than 100 checks for business purposes).

Finally, the Eleventh Circuit cases of *U.S. v. Carcione*, 272 F.3d 1297, 1299 (11th Cir. 2001) and *United States v. Godwin*, 765 F.3d 1306, 1323 (11th Cir. 2014) are distinguishable. Significantly, neither of those cases involve the alleged promotion of bribery of a public official *after* the public official is no longer a public official. Instead, they both focus on Hobbs Act robbery, namely the exchange of jewelry for cash following home invasion robberies.

In *Carcione,* this Circuit addressed whether the sale of jewelry obtained from a completed home invasion robbery could promote a Hobbs Act conspiracy under 18 U.S.C. Section 1956(a)(1)(A). This Circuit held that the sale of the diamond promoted the Hobbs Act conspiracy reasoning that "[a] financial transaction can promote a scheme that is ongoing. Here, the conspiracy to commit the robbery was ongoing at the time of the money laundering. From the beginning stages of conspiring to rob [the victim], to planning out the remaining steps leading up to the fencing of the diamond, it is clear to us that this scheme was an ongoing process.". *Carcione*, 272 F.3d at 1303.

By stark contrast, no FCPA violations or violations of Article 197 of the Venezuela Penal Code or Article 61 of the Venezuela Anti-Corruption Law (2003) were ongoing on May 17, 2013, because Claudia Diaz Guillen was no longer a public official. And, unlike *Carcione,* which alleged a conspiracy to commit Hobbs Act robbery as a specified unlawful activity, none of the specified unlawful activities in this case were conspiracies. Dkt. No. 311 at 31-32 (Court's Instructions)

(outlining the elements of the Venezuelan offenses); *see also id.* at 20-29 (describing the substantive FCPA offenses under 15 U.S.C. Sections 78dd-2 and 78dd-3).

In *United States v. Godwin*, 765 F.3d 1306, 1322-23 (11th Cir. 2014), this Circuit did not directly address whether to affirm a conviction for promotional laundering. Instead, it addressed whether promotional money laundering, which included Hobbs Act robbery as the specified unlawful activity, could form one of the two predicate acts necessary to show a pattern of racketeering activity to sustain a RICO conspiracy conviction under 18 U.S.C. Section 1962(d). The court relied heavily on the reasoning in *Carcione* because of the substantial factual similarities between *Carcione* and *Godwin.* Both cases involved a robbery and the subsequent sale of jewelry, and thus, the court in *Godwin* reasoned that the robbery and the sale of jewelry for cash were simply steps in the home invasion robbery designed to promote the robbery. *Godwin,* at 1323.

For the same reasons as *Carcione*, *Godwin* is unpersuasive. First, home invasion robberies are fundamentally distinguishable from offenses involving bribery or the offering of things of value to a public official. Second, there was insufficient evidence at trial that the wire transfer to Patric Love launched or encouraged the carrying on of a bribery scheme when Claudia Diaz Guillen was no longer a public official. *Leak,* at 213-14. There was no public official to bribe, no official act to induce or influence, and no act of a foreign official in her official capacity to influence or induce. *See* 15 U.S.C. Sections 78dd-2 and 78dd-3; *see also* Article 197 of the Venezuela Penal Code or Article 61 of the Venezuela Anti-Corruption Law (2003). Third, and similarly, because there was no public official to induce, influence, or bribe, the object of the promotional money laundering -- to retain or obtain business for Raul Gorrin by performing an official act or duty (Dkt. No. 44 at 14-17) – could not be the intent of the wire transfer to Patric Love.

24

Accordingly, judgment of acquittal as to Count 10 is warranted.

**E.  Acquittal is Warranted as to Counts 2, 9, and 10 Under *U.S. v. Christo* Because the Evidence at Trial Demonstrated that the Charged Money Laundering Offenses Were Not Separate and Distinct from the Specified Unlawful Activities – FCPA violations and violations of Article 197 of the Venezuela Penal Code, and Article 61 of the Venezuela Anti-Corruption Law (2003)**

Acquittal is warranted under *United States v. Christo,* 129 F.3d 578, 579 (11th Cir. 1997) as to Counts 2, 9, and 10 because the evidence at trial demonstrated that the charged money laundering offenses were one and the same as the underlying FCPA violations and/or the violations of Article 197 of the Venezuela Penal Code, and Article 61 of the Venezuela Anti-Corruption Law (2003).

In *Christo* this Circuit reversed a conviction for money laundering holding that the withdrawal of funds charged as the misapplication of bank funds and bank fraud could not also form the basis for the money laundering offense. *Christo,* 129 F.3d 578-79. In so holding, the court reasoned that the underlying predicate offense must be complete before any laundering can occur. *Christo,* at 578-79. The court then concluded that the evidence was "insufficient to establish that [defendant] engaged in a monetary transaction that was separate from and in addition to the underlying criminal activity." *Id.* at 580.

Here, applying *Christo,* the underlying FCPA or Venezuela bribery offenses., *i.e.,* Article 197 of the Venezuela Penal Code, and Article 61 of the Venezuela Anti-Corruption Law (2003), could not be completed until the monies from Gorrin were sent or received for the benefit of Claudia Diaz Guillen. *Id.* at 580. Yet, that is identical factual basis supporting the allegations of money laundering – that Gorrin transported, transferred or transmitted money from his Swiss bank accounts to bank accounts in Florida (Interglobal Yachts and Patric Love) to promote the carrying on of FCPA or Venezuela bribery offenses for the benefit of Claudia Diaz Guillen. Thus, *Christo*

warrants acquittal as to Counts 2, 9, and 10 because under *Christo* Mr. Gorrin could not agree to launder bribes and pay bribes to Claudia Diaz Guillen simultaneously.

## MOTION FOR NEW TRIAL

Under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). In analyzing this motion, the court's review is not identical to a motion for judgment of acquittal. "In a proper case — a case in which the evidence of guilt although legally sufficient is thin and marked by 'uncertainties and discrepancies,'— there is room between the two standards for a district court to reweigh the evidence and re-evaluate the credibility of witnesses." *Butcher v. United States,* 368 F.3d 1290, 1297 n.4 (11th Cir. 2004) (citation and internal quotation marks omitted); *accord United States v. Martinez,* 763 F.2d 1297, 1312-1313 (11th Cir. 1985)

Indeed, on a motion for a new trial based on the weight of the evidence, the court need not view the evidence in the light most favorable to the verdict. It may weigh the evidence and consider the credibility of the witnesses. *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980); *United States v. Simms,* 508 F. Supp. 1188, 1202 (W.D.La.1980). If the court concludes that, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Lincoln,* 630 F.2d at 1319.

This Circuit in *United States v. Martinez,* 763 F.2d 1297, 1312-1313 (11th Cir. 1985) reinforced this standard and further noted that:

> [c]ourts have granted new trial motions based on weight of the evidence only where the credibility of the government's witnesses had been impeached and the government's case had been marked by uncertainties and discrepancies. Thus, for example, in *United States v. Simms,* 508 F.Supp. at

1204-08, the court granted a new trial, explaining there was no direct proof of the defendant's guilt and that "[t]he government's case depends upon inferences upon inferences drawn from uncorroborated testimony that ... is subject to questions of credibility.

In deciding that trial courts wield this discretion, the court in *Martinez* cited to *United States v. Hurley,* 281 F. Supp. 443, 449 (D.Conn.1968) during which the trial court granted the new trial stating:

> If these factual issues were joined before the jury as matters of clear-cut conflicts in testimony, the jury's decision would remain inviolate. But such was not the case. The direct testimony of Rutt and MacFarlane [the government's key witnesses] was subject to serious impeachment by prior inconsistent statements and by independent evidence.

*Martinez,* 763 F.2d at 1312-1313, citing *Hurley* at 449.

Under these standards, and as set forth below, a new trial is warranted because standing alone, or in combination, these cumulative errors warrant a new trial. *United States v. Thomas*, 62 F.3d 1332, 1343 (11th Cir. 1995) ("t]he`cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible.")

### A. Introduction of Co-Conspirator Emails, Summary Tables, and a Summary of Summaries were Cumulative Errors Warranting a New Trial

Here, it was cumulative error warranting a new trial to permit the introduction of dozens of emails as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E) and to permit the introduction of summaries of supposed financial statements which were never authenticated by any witness, and which were not summaries of anything other than other summaries.

At trial, the government introduced troves of emails which included communications between or amongst Raul Gorrin, Andrade,[13] Asesor 1, 2, or 3, Elizabeth Gouveia, "gauchito," or in some cases did not include Raul Gorrin or Andrade. *See* GX6-32; *see also* GX 72-92; GX 94-97; GX 99-104; GX 128-131; GX 135, GX 137-138.

Equally as important, the emails above did ***not*** include Claudia Diaz Guillen or Adrian Velazquez Figueroa as participants in the email. The emails were not business records of any identifiable company. *See* Fed. R. Evid. 803(6). The emails were not statements of an opposing party under Federal Rule of Evidence 801(d). And the emails were not co-conspirator statements because none of the statements included in those emails were made in furtherance of the charged conspiracy which included, as participants, Claudia Diaz Guillen or Adrian Velazquez Figueroa. *See* Fed. R. Evid. 801(d)(2)(E).

Similarly, the government was permitted to introduce tables marked "AV," as attachments, to emails which, in several cases, did not include Adrian Velazquez Figueroa and did not include Claudia Diaz Guillen as a participant in the originating email. *See generally* GX 101-103; 105-106; 109-118; 120; 130; 135-136. No witness testified that the witness prepared those tables or that someone had authorized the witness to prepare those tables. *See* Fed. R. Evid. 901-902.

Making matters worse, the government was permitted to introduce a summary exhibit (GX 1050) of the inadmissible summaries above marked "AV" through Jaylene Padron in direct contravention of Rule 1006 and Rules 901-902. *See, e.g.*, *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004) ("Rule 1006 is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible."); *See generally* J. McLAUGHLIN, J. WEINSTEIN,

---

[13] The batch of emails at GX 6-32 included Andrade as a participant and were introduced through Andrade while the remaining emails were introduced through an agent with no personal knowledge of those emails.

M. BERGER, 6 WEINSTEIN'S FEDERAL EVIDENCE § 1006.03[3] (2d ed. 2004) ("Charts, summaries, and calculations are only admissible when based on original or duplicate materials that are themselves admissible evidence."); C.A. WRIGHT V.J. GOLD, 31 FEDERAL PRACTICE AND PROCEDURE § 8043, at 527 (2000) ("Rule 1006 evidence may also be excluded where the source materials are inadmissible hearsay or even where just some parts of those materials are inadmissible hearsay.").

Mrs. Padron was not able to authenticate the source of the information she used to create the summary in GX 1050 and introduced by the government. Mrs. Padron had no personal knowledge of those "tables" from which GX 1050 was derived. And, Mrs. Padron testified that those "tables" were not based on any underlying financial statements from any financial institution anywhere in the world. *See* Trial Transcript of Jaylene Padron, at 2026:5-12 and 2029:2-9 (December 9, 2022) (testifying that she could not confirm that any of the summaries she created were derived from any financial statements from any bank in the world).

For these reasons, and based on these cumulative errors, a new trial is warranted.

**B. Because the CIPA Process That was Implemented by the Court was Error and it was Error to Allow Mr. Andrade to Testify at Trial a New Trial is Warranted.**

The process by which information was withheld from Ms. Diaz Guillen and Mr. Velasquez Figueroa under the Classified Information Procedures Act ("CIPA") was error warranting a new trial because it prejudiced the outcome of the trial by precluding the defense from inquiring into exculpatory or impeachment information as to Ms. Diaz Guillen and Mr. Velasquez Figueroa.[14] Indeed, under these circumstances, it was error to permit Mr. Andrade to testify as a witness. *See generally* Dkt. No. 220 (Motion to Exclude Andrade)

---

[14] Defendants renew each of their arguments found at Dkt. No. 220.

In the instant case, prior to trial, the court reviewed classified materials *in camera.* Ms. Diaz Guillen and Mr. Velasquez Figueroa were not privy to the substance of the materials reviewed or the relief sought by the government. Ms. Diaz Guillen and Mr. Velasquez Figueroa were given absolutely no opportunity to be heard in relation to the *ex parte* proceedings. Instead, the court reviewed the materials *in camera* and ruled that Ms. Diaz Guillen and Mr. Velasquez Figueroa could not question government witness Andrade about unclassified information derived from the materials reviewed *in camera.* Finally, counsel for Ms. Diaz Guillen and Mr. Velasquez Figueroa were not given the opportunity to obtain security clearance to review the classified materials.

Accordingly, because the CIPA protocol followed by the court was error and it was error to permit Mr. Andrade to testify at trial when the proper remedy was exclusion of Andrade as a witness under CIPA, a new trial is warranted.

### C.  A New Trial is Warranted Because Mr. Camino's Testimony Likely Affected the Judgment of the Jurors in Rendering a Fair Verdict.

A new trial is warranted because of the introduction of Mr. Camino's testimony which was reasonably likely to affect the judgment of the jury in rendering a fair verdict.  Mr. Camino was the only witness that directly implicated Mr. Velazquez Figueroa in any criminal conduct. Further, much of Mr. Camino's testimony which implicated Mr. Velazquez Figueroa and/or Mrs. Diaz Guillen in any unlawful conduct was not based on any bank statements or emails or any other written communications and was based entirely on Mr. Camino's say-so (and his statements alone) or what Mr. Velazquez Diaz supposedly told him about meetings with persons (Raul Gorrin and Alejandro Andrade) Mr. Camino testified he never met.

First, Mr. Camino provided perjurious testimony about Leonard Dellan and Andrade. *See* Testimony of Maximilian Camino, 189:5-10 (December 5, 2022); Testimony of Max Camino, 238:20-25 and 239: 1-20 (December 5, 2022). That testimony remained uncorrected until Special

Agent Moreno testified and warranted a mistrial based on the *Napue* violation caused by his false

testimony. *Napue v. Illinois,* 360 U.S. 264, 269 (1959) (holding that the government "may not

knowingly use false evidence, including false testimony, to obtain a tainted conviction regardless

of whether the prosecutor solicits false evidence or … allows false evidence to go uncorrected

when it appears."); *see also United States v. Mangual-Garcia,* 505 F.3d 1, 10 (1st Cir. 2007); *see

also generally,* Dkt. No. 288 (Joint Motion for Mistrial).

Second, at the end of trial, Special Agent Erick Moreno testified that Mr. Camino's trial

testimony was entirely inconsistent with statements he made to Special Agent Moreno and other

agents during debriefings. *See* Trial Testimony of Agent Erick Moreno, (December 13, 2022).

Third, in closing argument, the government admitted that Max Camino lied.

Fourth, and equally as important, Mr. Camino admitted on cross-examination several times

that he made false statements under oath in immigration applications as recently as September of

2020.

Fifth, Mr. Camino testified that he deleted numerous – potentially exculpatory – emails with

Adrian Velazquez Figueroa and was permitted to search, at his own discretion, for emails he

deemed relevant to the government. To remedy this, the defense subpoenaed Mr. Camino in

October, but the court quashed the subpoena thus depriving the defense of potentially critically

relevant information and emails. *See* Dkt. No. 284 (entered 12/05/2022).

Sixth, Mr. Camino's testimony that there was a meeting between Adrian and Claudia with Mr.

Andrade was directly contradicted by the testimony of Alejandro Andrade and Claudia Diaz

Guillen. Mrs. Diaz Guillen testified:

> Q. Did Mr. Andrade call you on any of your phones at any point to ask you
> to work with Raul Gorrin?
> A. Never, never, never Andrade called me to work with Gorrin. He didn't
> even call me and I never even met with him either.

Q. Did you ever go to Alejandro Andrade's home in Wellington, Florida?
A. Never, I never went to his house. It just that I never had a social relationship with him.

*See* Testimony of Claudia Diaz Guillen, 2169:3-11 (December 9, 2022)

Similarly, Mr. Andrade never testified that any such meeting occurred and instead had no recollection of any meetings with Claudia or Adrian outside of Venezuela. *See* Transcript of Alejandro Andrade, 328-330(November 29,2022); Transcript of Alejandro Andrade, at 198(November 28, 2022).

In sum, for these reasons, a new trial is warranted.

## <u>CONCLUSION</u>

Judgment of acquittal is warranted as to Counts 2, 9, and 10 for Mr. Velazquez Figueroa and a judgment of acquittal is warranted as to Counts 2 and 10 for Mrs. Diaz Guillen. Alternatively, a new trial is warranted.

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that a true and correct copy of the foregoing document has been filed via electronic mail with the Clerk of the Court by using CM/ECF System which will send a notice of electronic filing to all attorneys who are authorized to receive service.

                                       */s/ Andrew S. Feldman*
                                       Andrew S. Feldman Esq