UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  18-cr-80160-DIMITROULEAS

UNITED STATES OF AMERICA

v.

CLAUDIA PATRICIA DIAZ GUILLEN AND
ADRIAN VELASQUEZ FIGUEROA,

Defendants.
_____/

## SENTENCING MEMORANDUM

On behalf of Claudia Patricia Diaz Guillen and Adrian Velasquez Figueroa.

/s/Marissel Descalzo
**TACHE BRONIS AND DESCALZO, P.A**
150 S.E. 2nd Avenue, Suite 600
Miami, Florida 33131
Office: (305) 537-9565
Florida Bar No. 669318
Email: mdescalzo@tachebronis.com
*Counsel for Claudia Diaz Guillen*

/s/Andrew S. Feldman
**FELDMAN FIRM PLLC**
150 S.E. 2nd Avenue, Suite 600
Miami, Florida 33131
Direct: (305) 714-9474
Florida Bar No. 60325
Email: afeldman@feldmanpllc.com
*Counsel for Adrian Jose Velazquez Figueroa*

**Table of Contents**

I.   **Introduction** ................................................................................4

II.  **The Need to Avoid Unwarranted Sentencing Disparities Among Defendants** ................................................................................5

    **a.  Sentences for co-conspirators in this case** ............................5

    **b.  Sentences in other FCPA/Money Laundering Cases** ...............7

    **c.  Average Sentences Length for Bribery and/or Corruption in 2021** .........9

III. **Violation of Venezuelan Law and Penalties** ..........................10

IV. **The Advisory Guidelines Ranges Significantly Overstate the Seriousness of the Offense** ..............................................................11

V.   **OTHER SECTION 3553(a) FACTORS** ...............................16

    **a.  Claudia's and Adrian's History and Characteristics** .............17

    **b.  The Nature and Circumstances of the Offense** ......................18

        *i.  History of Casas de Bolsa* .........................................18

        *ii.  The ONT was Profitable During Claudia's Tenure* ..............21

        *iii. Lack of a Connection to the United States* ......................24

    **c.  The Need for the Sentence to Reflect Seriousness of the Crime, Respect for the Law, Just Punishment, Adequate Deterrence, and Protection of the Public** ........................................26

        (1) Expulsion from Venezuela ......................................26

        (2) Kidnapping in Dominican Republic..........................27

        (3) Extortion in Madrid ...............................................27

        (4) Venezuela Investigation .........................................28

        (5) United States Extradition Request.............................29

        (6) Criminal Proceeding in Spain ..................................30

        (7) OFAC Sanctioned..................................................30

        *(8) United States v. Prosperi* ......................................31

VI. **Trial Penalty** .................................................................31

    **a.  Inability to Cooperate** ......................................................34

**VII.**................................................................**Downward Departure**
................................................................................34

   **a.** **Claudia and Adrian's Extreme Family Situation Warrants a Departure**..
................................................................................35

**VIII. Conclusion** ........................................................38

**CERTIFICATE OF SERVICE** ........................................38

This sentencing memorandum is submitted in anticipation of the sentencing hearing scheduled in this case on April 17, 2023.  We ask for sentences for Ms. Diaz Guillen and Mr. Velasquez Figueroa that are consistent with the sentence they would receive if convicted in their country, where the conduct occurred – Venezuela.

## I.    Introduction

While this Court had the opportunity to learn about Claudia and Adrian over the course of several weeks at trial, there is more complexity to the story, including politics.   A deeper dive is necessary in order to give the Court a complete picture of Claudia and Adrian and the series of events that brought them before this Court.

We urge the Court to impose sentences on Claudia and Adrian that are in line with those sentences of their alleged co-conspirators and others charged in similar cases.  We propose sentences, whether by departure or variance, that will accomplish through incarceration the harsh punishment that society seeks, but that does not amount to crushing sentences that would be excessive and profoundly unjust.  Given the factors outlined here, we urge the Court that the appropriate sentences for Claudia and Adrian should be the sentence they would receive if convicted in their own country – Venezuela.

## II.     The Need to Avoid Unwarranted Sentencing Disparities Among Defendants

Federal judges retain a significant amount of discretion over sentencing and Chapter 18, Section 3553(a) instructs judges to impose sentences that are "sufficient, but not greater than necessary," to achieve the recognized goal of sentencing.  Section 3553(a) specifically instructs judges to consider "the need to avoid unwarranted sentence disparities among similarly situated defendants."

### a.     Sentences for co-conspirators in this case

The government is seeking extremely harsh sentences and penalties here.  For Claudia, the government is seeking a sentence of LIFE[1] , a fine of $8 million, forfeiture in the amount of $136 million, and continued placement on the OFAC list. For Adrian, the government is seeking a sentence of upwards of 15 years a fine of $8 million, forfeiture in the amount of $136 million, and continued placement on the OFAC list.  The sentences and penalties sought are grossly disproportionate with the consequences imposed on other players in this case.

**Alejandro Andrade,** for instance, engaged in the receipt of bribes while treasurer of the ONT from 2007 through 2011.  If he is to believed, he moved to the United States in 2012 and continued to receive bribe money from Raul Gorrin and

---

[1] The draft Pre-Sentence Report states that the appropriate guidelines range for Ms. Diaz Guillen is 43 [D.E. 352].  The government's objections argue that the appropriate guideline range is 54 [D.E. 354].

others.  The amount of money involved in Andrade's case is alleged to be $1 billion. Andrade was only required to plead guilty to the conduct while he was treasurer and was sentenced to ten years.  Due to his cooperation, his sentence was reduced to three years.  He will receive an S Visa.  And he is not on the OFAC list.

Andrade's uncle, **Rafael Cedeno**, who owned and operated one of the casas de bolsa that was given an exclusive contract with the ONT during Andrade's tenure, was not prosecuted.  In fact, Andrade alerted Cedeno to the government investigation and Cedeno fled to Switzerland.  Cedeno kept all the proceeds of his involvement in the casas de bolsa exchange.  Cedeno was never indicted.  Cedeno is not on the OFAC list.

Like Cedeno, **Maximilian Camino** received complete immunity.  Not only was Camino involved in the instant case, Camino admitted to lying to immigration officials and providing fraudulent information to immigration.  *See* Maximilian Camino, Trial Tr. 12/5/2023, 1150.  Camino submitted fake bids to the ONT's Director of Finance.  Camino purchased bonds, exchanged them, and through his uncle sold the proceeds on the parallel market.  Camino will not be prosecuted in this case.  He will not be prosecuted for his immigration fraud.  Camino will be able to remain in the United States as a United States citizen.  Camino has not been placed on the OFAC list.  Camino is living in a multi-million-dollar apartment on Miami Beach and he and his wife continue to drive Bentleys.

**Joel Brakha** was also not charged.  Brakha funneled money through his United States business for Raul Gorrin and others for over ten years.  Brakha moved money overseas to avoid paying taxes in the United States.  Brakha will not be prosecuted.  Brakha was not placed on the OFAC list.  Brakha kept all proceeds received.

### b.    Sentences in other FCPA/Money Laundering Cases

Not only is the sentence sought by the government in this case unreasonably harsh compared to others charged or otherwise involved in the same case, but it is also unreasonably harsh when compared to sentences sought and received in other FCPA and/or money laundering cases.  For instance, in *United States v. Roger Ng*, Case No. 18-cr-00538 (E.D.N.Y.), the government sought a sentence of 15 years and Ng was sentenced to 10 years.  Ng went to trial and lost.  The case is referred to as the 1MBD scandal and is said to be one of the world's largest financial scandals.  1MBD was a wealth fund created by the prime minister of Malaysia in order to alleviate poverty and build infrastructure and housing in Malaysia.  Ng is alleged to have been a central player for Goldman Sachs, a United States company, and was employed as Managing Director of several Goldman Sachs subsidiaries.  Ng allegedly assisted in raising ***$1.4 billion*** that was later misappropriated.  Ng allegedly paid kickbacks, on behalf of Goldman Sachs, to officials in Malaysia and United

Arab Emirates.   The victims of this scheme – the people of Malaysia – will never recover all that was embezzled.

In *United States v. Roberto Enrique Rincon-Fernandez*, Case No. 15-cr-00654 (S.D.TX), Rincon-Fernandez was charged in an 18-count indictment with various FCPA and money laundering violations.   Rincon-Fernandez is a resident of Texas with closely held corporations in Texas Rincon-Fernandez's companies had contracts with PDVSA to sell oil equipment in the amount of ***$500 million a year***. Rincon-Fernandez pled guilty to paying bribes to officials of PDVSA (Venezuela's state-owned oil company) in exchange for lucrative contracts ***over the course of 9 years***.  Rincon-Fernandez admitted that he overcharged PDVSA in order to cover the bribes.  He further admitted that many times nothing was delivered to PDVSA and he would just pocket the money.   Rincon-Fernandez was sentenced to 18 months.

In *United States v. Armengol Alfonso Cevallos Diaz*, Case No. 19-cr-20294 (S.D.FL.), Diaz, a United States citizen, pled guilty to using his U.S. bank accounts to pay $4.4 million in bribes to an Ecuadorian state-owned oil company in order to obtain and retain business for his United States company.   Diaz further agreed that he used his United States company to launder the proceeds of the crime.   Diaz received 35 months.   His co-defendant was sentenced to 20 months.   Notably,

Ecuador suffered loss in the form of overpaying for contracts with Diaz's United States company.

In *United States v. Mark Lambert*, Case No. 18-cr-00012 (D. MD), Lambert was convicted at trial and sentenced to 48 months.  At trial, the evidence established that for 7 years, Lambert was bribing a Russian official to secure contracts.

In another case, that is most like the instant, *United States v. Luis Enrique Martinelli Linares and Ricard Enrique Martinelli Linares*, Case No. 21-cr-00065 (E.D.N.Y.), the defendants were sentenced to 36 months.  The defendants pled guilty to a money laundering conspiracy.  The cases involved the payment of bribes in exchange for contracts with Odebrecht S.A. that were laundered through United States banks.  The amount laundered was $28 million.

**c.    Average Sentences Length for Bribery and/or Corruption in 2021**



The figure includes the 247 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
FILTER:

*See* United States Sentencing Commission Interactive Data Analyzer, Fiscal Year 2021, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard.

### d. Distribution of Sentences for Bribery and/or Corruption in 2021



- 191 offenders received a sentence of up to 24 months
- 33 offenders received a sentence between 24-59 months
- 20 offenders received a sentence between 60 and 119 months
- 3 offenders received a sentence of 120 months

*See* United States Sentencing Commission Interactive Data Analyzer, Fiscal Year 2021, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard.

## III.   Violation of Venezuelan Law and Penalties

Here, the government alleged, and the jury was instructed, that the underlying offense to money laundering was the potential violation of Venezuelan law:Article 197, Title III, Of Crime Against Public Matters and Article 61, Anti-Corruption. Presumably, the government alleged that Adrian, a Venezuelan citizen during the relevant time period of charged conduct, and Claudia, an official and public servant of Venezuela during the relevant time period, would be charged and convicted of Article 61 and/or Article 197, if charged in their own country, by their own laws, and by their own government.  The penalty for violation of Article 197 is one to two

months.  The penalty for violation of Article 61 is one to four years.  Yet, the United States government, in a land foreign to Claudia and Adrian, want to them sentenced to LIFE and 15 years, respectively, for violations of these very laws.  It seems that the government is trying to police foreign conduct.  This is something that is squarely left in the hands of Congress and the President of the United States, not the Department of Justice.  And clearly, if Venezuela, the country that such conduct is relevant to, believes these offenses should result in a maximum sentence of four years, the government has no business seeking unduly harsh sentences reserved for the absolute worst crimes for Claudia and Adrian.

## IV.  The Advisory Guidelines Ranges Significantly Overstate the Seriousness of the Offense

The guideline range proposed in the PSR is a Level 43, which corresponds to a life sentence, for Claudia.  The government argues for a Level 54.  For Adrian, the PSR proposes a Level 36, which corresponds to a sentence of approximately 15 years.   These numbers are disproportionate to the offense.

Life sentences are reserved for the worst crimes and offenders.  For instance, in 2017, Sayfullo Saipov was sentenced to life in the Southern District of New York. *See United States v. Saipov*, Case No. 17-CR-722 (S.D.N.Y. 2018).  Saipov was responsible for the 2017 ISIS terrorist attack.  Specifically, on Halloween afternoon 2017, Saipov used a 6000 pound truck to strike more than 20 innocent people on the Hudson River Bike Path.  Saipov killed 8 innocent bystanders.  He critically injured

12 others, including a 14-year-old child.  The living victims suffered life altering physical injuries including amputations and brain injuries.  He was convicted of 9 capital counts.

In fact, between 2016 and 2021, only 709 federal offenders were given a life sentence.[2]  For the most part, those offenders receiving life sentences were charged with murder and/or were repeat sex offenders with charges involving minor children.[3]

To further illustrate the excessive nature of these ranges, it is demonstrative to compare it to other offenses considered serious enough by the Commission to warrant these types of offense levels:

| Crime | Offense Level | Guidelines |
|---|---|---|
| First degree murder | 43 | 2A1.1(a) |
| Attempted murder for hire where the object of the offense would have constituted first degree murder, the victim sustained permanent or life-threatening bodily injury. | 41 | 2A2.1(a)(1) |
| Criminal sexual abuse of a child under 12 years old by force, threat of death, or rendering the victim unconscious by force or drugs | 42 | 2A3.1(a)(1) |
| Kidnapping where the victim was both sexually exploited and sustained a permanent or life-threatening injury. | 42 | 2A3.1(a)(1) |

---

[2] *See* United States Sentencing Commission, *Life Sentences in the Federal System*, (July 26, 2022) available at www.ussc.gov.
[3] *Id.*

| Crime | Offense Level | Guidelines |
|---|---|---|
| Aircraft piracy resulting in death. | 43 | 2A5.1(b)(1) |
| Aircraft piracy not resulting in death. | 38 | 2A5.1(a) |
| Wire fraud causing loss of an unlimited amount of money in excess of $400,000,000 without other aggravating characteristics. | 37 | 2B1.1 |
| Robbery with discharge of firearm causing permanent or life-threatening injury and a loss of more than $5,000,000. | 40 | 2B3.1 |
| Counterfeiting more than $400,000,000 of United States currency. | 39 | 2B5.1 |
| Distribution of an unlimited amount of every type of unlawful drug. | 38 | 2D1.1 |
| Sex trafficking of children under the age of twelve by means of force. | 42 | 2G1.3(a)(1) |
| Production of sadistic and masochistic pornography involving children under the age of twelve. | 40 | 2G2.1 |
| Selling or buying children for use in the production of pornography. | 38 | 2G2.3 |
| Distribution of an unlimited number of every type of unlawful firearm. | 34 | 2K2.1 |
| Treason tantamount to waging war against the United States. | 43 | 2M1.1 |
| Gathering and transmitting top secret national defense information to aid a foreign government. | 42 | 2M3.1 |
| Unlawful activity involving nuclear weapons and biological or chemical weapons of mass destruction with intent either to injure the United States or to aid a foreign terrorist organization. | 42 | 2M6.1 |
| Continuous tampering with a public water system causing permanent or life-threatening injury to an unlimited number of people. | 37 | 2Q1.4 |

| Crime | Offense Level | Guidelines |
|---|---|---|
| Willful evasion of more than $400,000,000 of income tax. | 36 | 2T1.1(a)(1) |

It would be nothing short of ludicrous to compare Claudia and Adrian's conduct with crimes such as first-degree murder, providing nuclear and biological weapons of mass destruction to foreign terrorist organizations, the distribution of unlimited amounts of illegal drugs and guns, or other economic crimes causing unlimited amounts of harm in excess of $400,000,000.

Here, the government argues for an additional 24[4] point bump in the total offense level based entirely on the amount of the alleged bribes. By contrast, in §2A, governing violent crimes, there are no double-digit enhancements. Examples of other double-digit enhancements in the Guidelines include a 15-level enhancement for trafficking in portable rockets (2K2.1(b)(3)(A)) and for boarding air planes with bombs (2K1.5(b)(1)), and there are 12-level enhancements for committing a felony to promote terrorism (3A1.4(a)) and for obstruction of justice related to terrorism (2J1.2(b)(1)(C). A 24-level enhancement for monetary loss is illogical. The loss table therefore ignores the differences between violent and non-violent crimes and is a "relatively weak indicator of the moral seriousness of the offense or the need for

---

[4] It is the defense's position that the $136,752,007.46 has no basis in evidence or even reality and should not be the number used to calculate the total offense level.

deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. Aug. 4, 2005).

In fact, throughout the past decade, legislators, law school professors, advocacy groups, the American Bar Association and the NACDL, and even former federal prosecutors have all criticized and challenged the application of the loss table. This is largely because the fraud Guideline is not premised on reliable empirical data. *See* Mark W. Bennett et al., Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform, 102 Iowa L. Rev. 939, 979 (2017); *see also* Van Meter, "*One Judge Makes the Case for Judgment,"* The Atlantic (Feb. 25, 2016) (Mark Osler, a professor of law at Baylor Law School and a former AUSA observed: "The whole structure is still guidelines-focused … That baseline seems so objective. It's a number, and there's this presumptive objectivity when you're looking at something that says, '121 months.' Because it's so specific, it has this veneer of science around it. Where, in reality, it's pretty much just made up.").

Accordingly, Claudia and Adrian's sentence should not be determined by a mechanical application of the loss table based on an arbitrary number put forth by the government without any evidence. *See United States v. Collins,* No. 07 CR 1170 (LAP) (S.D.N.Y. July 15, 2013) (Honorable Loretta A. Preska, Chief Judge of the Southern District of New York, varied from the Guidelines in a case where the loss

figures were in the billions); *Pepper v. United States*, 552 U.S. 1089 (2011); *Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough vs. United States*, 552 U.S. 101-02, 109-10 (2007) (emphasizing that when a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary to achieve § 3553(a)'s purposes, even in a mine-run case."); *Rita v. United States*, 551 U.S. 351, 357 (2007).

## V.   OTHER SECTION 3553(a) FACTORS

The Sentencing Guidelines are not presumed to be reasonable; they are simply one of the many factors to be weighed when fashioning a sentence sufficient to satisfy the purposes set forth in 18 U.S.C. 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Under *Gall*, the advisory guidelines range is not afforded any particular weight in determining an appropriate sentence. *United States v. Irey*, 612 F.3d 1160, 1217 (11th Cir. 2010). The Court must conduct its own evaluation of the 3553(a) factors and may reject, after due consideration, the advice of the Guidelines. *Kimbrough v. United States*, 552 U.S. 85, 113 (2007).

In light of the factors set forth herein, we respectfully urge the Court to impose a sentence of twenty-four months, which is sufficient – but not greater than necessary – to satisfy the factors outlined in 18 U.S.C. §3553(a). *Id*. at 101.

### a.      Claudia's and Adrian's History and Characteristics

As the court heard during the trial, Claudia and Adrian entered the Venezuelan army at a very young age.  They rose through the ranks until they had highly coveted positions in President Hugo Chavez's inner circle.  These positions came at a heavy price.  They worked endless hours, were required to give complete loyalty, and would spend a lot of time away from their families.

There were times when Claudia had multiple positions, including working at the ONT and working as President Chavez's nurse.  As President Chavez's nurse, she had to travel with him on his official business and be on call 24 hours a day.  Claudia had many more jobs in government over the course of her career.  It is important to note that Claudia's position as treasurer only lasted less than 2 years in the course of her 25-plus years in government.

Adrian was part of President Chavez's official escort.  He had a seat on the Presidential plane.  Adrian had a very specific function, which was to carry the money that would be used for President Chavez's charity gifts.  President Chavez often gave money or purchased items for citizens that approached him or sent him letters.  It was Adrian's job to make sure the money was available for the charity gifts and to secure donations for the gifts.  Adrian was also charged with protecting the President.

Claudia and Adrian met at the Presidential Palace.  They married a short time later and had their first son, David.  David is 14 years old today.  Claudia and Adrian struggled to conceive and eventually adopted a second son in 2019 – Jonathan. Jonathan is 4 years old today.

### b.     The Nature and Circumstances of the Offense

The nature and circumstances of this case are unlike many cases before United States courts.  The reason – the Venezuelan economy operates in a very different manner than the economy in the United States.  Venezuelans face inflation of epic proportions.  Their currency is constantly devalued.  President Hugo Chavez wanted to maintain the value of the Venezuelan currency, as a result, the permuta market was created.  The permuta market involves the purchase and sale of currency in a parallel market at premium rates.  The parallel market is created by inflation and the inability of the government to meet supply demands.  The permuta market is not limited to Venezuela; it exists in other Latin American countries, and is not illegal.

Adrian operated in the permuta market.  He would make money in bolivars and trade for dollars.  This is something all businessmen did in Venezuela.

### i.     *History of Casas de Bolsa*

As stated in Alejandro Andrade's Factual Proffer and affirmed at trial, prior to May 10, 2011, the Oficina Nacional del Tesoro ("ONT") or the Venezuelan National Treasury held U.S. dollar accounts at various financial institutions.  The

ONT would sell bonds from its portfolio that were denominated in U.S. dollars or other currencies and would receive payment in bolivars.  The bonds were sold to the National Bank or to casas de bolsa.  The National Bank and the casas de bolsa exchanged the currency in a parallel market at a higher exchange rate.  The margin was profit.  When Andrade was the treasurer, he had the ability to pick exchange houses that had the exclusive right to purchase the bonds from the ONT.  Andrade picked three exchange houses to work with the ONT and received kickbacks in exchange for preferential treatment.

In May 2010, the ONT would then exchange the proceeds from these bond sales at the National Bank or at casas de bolsa.  The National Bank and casas de bolsa would sell currency to the public in a parallel market at a premium rate.

Shortly after the change in the bond system, Alejandro Andrade was removed as treasurer and Marcos Torres was appointed.  Notably, Andrade served in the treasurer position from April 2007 to January 2011.  Unlike Andrade, Marcos Torres did not stay on the job very long because he didn't do a good job.  He was replaced by Claudia.

By the time Claudia became treasurer, the bond system was completely changed from the Andrade years.  The sale of bonds was done electronically and was available to anyone that could pay.  The only requirement was the money to purchase.  The casas de bolsa were gone.

Q.   Mr. Andrade, President Chavez, May 2010,
raided the casa de bolsas in Venezuela; is that
right?

A.   Yeah.  Yes, that's true.

Q.   And he shut down Econoinvest.  Do you
remember that?

A.   Yes.

Q.   He sent a bunch of security in to shut them
down.  Do you remember that?

A.   It's possible.  I do not recall the details.

Q.   Do you remember that Econoinvest is the casa
de bolsas that was supposedly owned by Leo Gonzalez?

A.   Yes.

Q.   You didn't remember that a second ago --
right?  -- but I reminded you when I said the name?

A.   Yes.

Q.   And President Chavez closed the casa de
bolsas because he didn't like what those operators
were doing; isn't that right?

```
     A.   Yes.

     Q.   And the minister of finance, Giordani, and
President Chavez came up with a new system to sell
the bonds.  Do you remember that?

     A.   Yes, of course.

     Q.   And it was a system on a website that you
would log in and you could buy bonds?

     A.   Yes.

     Q.   And anyone in Venezuela could come and buy a
bond?

     A.   Yes.

     Q.   All you had to have was money in bolivars to
pay for the bond?

     A.   Yes.

     Q.   So Claudia had no benefit to give Raul
Gorrin.  He could have gone in and bought those bonds
all he wanted.  Is that right?

     A.   Yes, it could have been.  That is correct
but --
```

Alejandro Andrade, Trial Tr., 302-303, 11/29/2022.

> ii.   *The ONT was Profitable During Claudia's Tenure*

It is undisputed that there is no victim in this case.  The undisputed evidence

at trial was that the ONT was sold at a premium and resulted in a profit to the ONT.

```
Q.   And you would get a profit from that?

A.   You would sell the bonds in an international
market.  At that point there was a loss because when you
bought the bonds, you were buying it at a higher rate.
You would sell the bonds, and then you get hard
currency.  You would then sell off whatever you needed
to sell on the parallel market to pay off the bolivars.

Q.   So you would purchase the bond at the official
government rate.  You would convert it to --

A.   Hard currency.  Like sell the bond and have
like $10 million but in cash in a -- in a bank account.

Q.   Okay.  And when you did that sale, you lost
money?

A.   Yes.

Q.   Okay.  So you're getting a bond from the ONT at
the official rate; is that right?

A.   Correct.
```

Maximilian Cedeno, Trial Tr. 12/5/2023, 1162.

```
Q.   The Venezuelan treasury requires that the bonds
be purchased as soon as you put in your bid?

A.   Correct.

Q.   Or your bid is accepted, I should say --

A.   Yes.

Q.   -- right?

So the treasury demands that the bolivars
immediately be deposited into their account?

A.   Accounts.  Yeah.

Q.   And then bolivars are deposited, you get the
bond, you trade it for hard currency, and you lose
money?

A.   Yes.
```

Maximilian Cedeno, Trial Tr. 12/5/2023, 1163.

> Q.   Okay.  So you're actually paying the treasury
> of Venezuela or the ONT, a premium to purchase the bond?
> A.   Correct.
> Q.   And when you pay that premium to purchase the
> bond, when you sell it on the back end, you're actually
> losing money?
> A.   Correct.
> Q.   Because this was a money-making venture for the
> treasury?
> A.   Yes.

Maximilian Cedeno, Trial Tr. 12/15/2023, 1170.

There was also evidence introduced directly from the ONT that showed the sale of bonds was profitable.  This is unlike other FCPA/money laundering cases that the government has prosecuted as discussed in Section II.

### REVENUE FROM INTEREST
(Expressed in Bs.)

| Institution | Currency | Instrument | Interest in original currency | Commissions | Net Interest Converted to Bs. |
|---|---|---|---|---|---|
| BSI | USD | Term Deposit | | | |
| BSI | USD | Call | | | |
| BSI | GBP | Term Deposit | 161.32 | | 1,116.37 |
| BSI | EUR | Term Deposit | 450.71 | | 2,482.47 |
| DEUTSCHE BANK | USD | Term Deposit | | | |
| BANK OF THE TREASURY | USD | Term Deposit | | | |
| JP MORGAN | USD | Current Account | 4,685.97 | | 20,149.67 |
| JP MORGAN | GBP | Current Account | | | |
| JP MORGAN | EUR | Current Account | 805.41 | | 4,281.63 |
| BANDES | VEF | Trust | 1,976,225.81 | 1,976,188.29 | 37.52 |
| BIV | VEF | Trust | 2,990,271.00 | | 2,990,271.00 |
| BANK OF THE TREASURY | VEF | Trust | 30,184.49 | 29,989.78 | 194.71 |
| BICENTENARIO | VEF | Trust | 2,396,916.80 | 234,290.03 | 2,164,626.77 |
| DPF's - VARIOUS BANKS | VEF | Term Deposit | 1,285,840.00 | | 1,285,840.09 |
| **Total Interest** | | | | - | **6,469,000.22** |

#### OTHER TRANSACTIONS

| Instrument | Currency | Operation | Amount in Bs. |
|---|---|---|---|
| TSY 2 1/4 2014-368 | USD | Sale of instruments | 100,071,405.03 |
| **Total Other Operations** | | | **100,071,405.03** |

| Total revenue for the Week | 106,540,405.25 |
|---|---|

6



DEFENDANT'S
EXHIBIT

**27a**



### iii.    Lack of a Connection to the United States

 Claudia and Adrian were not accused of bribing a United States entity. Claudia and Adrian did not work for a United States entity that used its foreign agents or contractors to bribe foreign officials to its benefit. And Claudia and Adrian were not working abroad and acting as foreign agents of a U.S. company bribing foreign officials to benefit a U.S. company or its subsidiaries. These are the fact patterns that are typical of most – if not every single one of these cases – that the government has historically elected to prosecute, *e.g.*, Citgo, JP Morgan, Stryker, Oracle, Honeywell, Alcatel, Odebrecht, etc.

 Moreover, as this Court knows, Claudia and Adrian did not live in the United States and had not been here for almost a decade prior to their extradition. Claudia and Adrian were accused of violating Venezuelan law and causing Raul Gorrin, or

his agents, to wire approximately $6 million to the United States. Close to $4 million of that amount were sent to the U.S. in May of 2013 *after* Mr. Diaz Guillen was no longer a public official capable of acting in any official capacity. In fact, as Mrs. Matsuo testified at trial, those funds were used to promote the operations of a very real design company known as Patric Love. The other company is still owned by Joel Brakha and it operates and charters yachts and has done so for years and years.

Claudia and Adrian's prosecution is therefore unique. The connection to the United States is limited to the wiring of funds supposedly generated from bribery wholly occurring outside of the U.S. – in Venezuela or Switzerland. Indeed, in other contexts, this is a perfect *civil* asset forfeiture case for the government. Prosecute the funds, not the people. But this case is about Venezuela. And the government must send a strong message to Venezuelans everywhere that they will be prosecuted wherever they are in the world, no matter how many children the prosecution orphans, and no matter how much taxpayer money we use to investigate and prosecute Venezuelans. The rule applies even if those Venezuelans are not part of the current Maduro regime, as is the case here.

For these reasons, the case represents a scenario which is plainly outside of the heartland of FCPA-based money laundering cases that the government prosecutes in the United States, and Mrs. Diaz Guillen and Mr. Velazquez Figueroa are therefore deserving of downward departures or variances.

c. **The Need for the Sentence to Reflect Seriousness of the Crime, Respect for the Law, Just Punishment, Adequate Deterrence, and Protection of the Public**

Section 3553(a)(2) directs the Court to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant.

The jury determined that Claudia and Adrian committed a serious offense that merits real punishment. But the Supreme Court recognized in *Gall v. United States*, 552 U.S. 38, 54 (2007) that fashioning a sentence "to promote respect for the law" does not invariably point towards harsher sentences. Under the circumstances of this case, a sentence in line with the type of sentence Claudia and Adrian would receive for violation of same crime in Venezuela will achieve this goal.

Claudia and Adrian have already been severely punished. They have been pursued, extorted, prosecuted, and living under the threat of death and/or criminal prosecution for over ten years.

(1) Expulsion from Venezuela

Following the death of President Chavez, Claudia was replaced as treasurer. Because Adrian's position provided for a higher security level, he was ousted from the country on a threat of death and never permitted to return. Claudia stayed behind wrapping up their affairs and living in fear. David, a young boy at the time, left the

26

country with Adrian for fear he would be in danger in Venezuela. Claudia was separated from her family for some time and living in constant fear for her life and that of her family. Claudia could not leave Venezuela until she was given her retirement from the military, and she did not receive it right away. Eventually, the entire family relocated to the Dominican Republic where they had friends. Unfortunately, their peace did not last long.

(2)     Kidnapping in Dominican Republic

Claudia and Adrian attempted to build a life in the Dominican Republic. While Claudia and Adrian had friends there, their family was still living in Venezuela. Claudia and Adrian lived in a state of fear for their family and themselves. They were also unable to see their parents and siblings. Nonetheless, Claudia and Adrian tried to work and reestablish their lives.

Their time in the Dominican Republic was short lived. After a short period of time living there, someone attempted to kidnap Claudia and Adrian. It is unclear who ordered the kidnapping, but they were sufficiently scared that they fled once again to Madrid, Spain with their son and never returned.

(3)     Extortion in Madrid

Claudia and Adrian had to start again in Madrid. Again, they were alone with David, in a new city, without any family, and without the ability to go home to Venezuela. Shortly after arriving in Madrid, in 2016, Adrian and Claudia were

vulnerable and fell victim to those that wanted to take advantage of their situation. Claudia, Adrian, and David were kidnapped, held hostage, and extorted. The kidnappers were tied to the Spanish police and/or government and were demanding information that Claudia did not have. The family was grabbed at their home, taken in a car to a hotel, and kept there over the course of several days. They were able to escape through a back door from the hotel where they were held. The situation was even more traumatic for Claudia because she was recovering from the loss of a baby that she and Adrian had been trying to conceive through IVF treatments for years. Claudia was never able to conceive again, which led to the decision to adopt Jonathan.

(4)     Venezuela Investigation

In 2018, Venezuela sought Claudia and Adrian's extradition for allegedly receiving illicit proceeds[5]. Claudia and Adrian were hauled off to jail. After their initial appearance, they were put on house arrest pending resolution of the extradition request.

To further complicate matters shortly before the Panama Papers became public, Adrian was contacted by a reporter asking for a bribe in exchange for not releasing the name of his company, MJ Box Tool, as part of the Panama Papers.

---

[5] The Spanish court denied Venezuela's extradition request. The Spanish court determined that Venezuela had not alleged a crime.

Adrian refused to pay the bribe.  As a result, MJ Box Tool's relation to the Panama Papers was released publicly.  As a result of the Panama Papers, Venezuela opened an investigation into Adrian, Claudia, and their family in Venezuela.   The Venezuelan government went to Claudia's mother's home, threatened her, and took away all her property, including a home that had been in the family for generations. The Venezuelan government is currently using the family home as a place to torture people.  All of Claudia's property was taken by the government – property that she owned prior to becoming treasurer.  Claudia lost touch with her mother for weeks and could not locate her.  Because Adrian's mother and brother worked for MJ Box Tool, the government arrested and tortured them.  The Venezuelan government also seized property belonging to Adrian's mother and brother.  Adrian's property was also taken.  For instance, the office of MJ Box Tool was confiscated and used as a government office.  Adrian's mother and brother continue to suffer the psychological effects of the torture today.  Adrian was helpless in assisting.

(5)     United States Extradition Request

Once Claudia and Adrian were indicted in the United States, the government sought their extradition.  Once again, Claudia and Adrian were arrested in their home and hauled off to jail.  They were released on house arrest pending resolution of the extradition.

(6)    Criminal Proceeding in Spain

In addition to this case, Claudia and Adrian have been the subjects of criminal investigations in Spain.

(7)    OFAC Sanctioned

Between 2018 and 2019, Claudia and Adrian had lawyers communicating with the United States authorities.  The government wanted Claudia and Adrian to cooperate, but because Claudia and Adrian did not have information about the instant offense, they could not do so.  Immediately following their rejection of cooperation, in 2019, the United States Treasury Department put Claudia and Adrian on the OFAC sanctioned list.  OFAC sanctions are reserved for terrorists and those individuals that pose a threat to the security of the United States.  Claudia and Adrian are neither.  The OFAC sanctions are financial death.  Claudia and Adrian cannot work ortransact business; it is close to impossible to engage in any bank transactions and they cannot even order an Uber ride, among other consequences.  Despite being incarcerated in the United States – Claudia for a year and Adrian seven months – they remain on the OFAC sanction list.  Because OFAC sanctions are so arbitrary and close to impossible to dispute without the assistance of the United States government, this will be a lifelong punishment.

(8)     *United States v. Prosperi*

The court in *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012)

approved of the lower court's reasoning that there is inherent punishment to a person

who is forced into the criminal justice system for the first time:

> I think it is very difficult at times, for those of us who are judges or
> prosecutors or lawyers, to put ourselves in the shoes of a person with
> no prior experience with the criminal justice system who finds himself
> or herself accused of a crime. I do not think, sometimes, we fully
> recognize the anguish and the penalty and the burden that persons face
> when called to account, as these men are, for the wrong that they
> committed.

This is Claudia and Adrian's first time in the criminal justice system, so this

inherent punishment applies to their cases.

## VI.     Trial Penalty

Guilty pleas have replaced trials for a very simple reason: individuals who

choose to exercise their Sixth Amendment right to trial to face exponentially higher

sentences if they invoke the right to trial and lose.

The trial penalty results from the discrepancy between the sentence the

prosecutor is willing to offer in exchange for a far less incentive for defendants to

plead guilty. *Id.* In 1970, 15 percent of federal cases went to trial. This number

rapidly declined with the inception of the Federal Sentencing Guidelines. The

amount of trials came to an all-time low in 2015 where only 2.9% of cases went to

trial. In 2016, 97.3% of defendants in the federal criminal justice system opted to plead guilty.

In the words of John Adams, "[r]epresentative government and trial by jury are the heart and lungs of liberty. Without them we have no other fortification against being ridden like horses, fleeced like sheep, worked like cattle, and fed and clothed like swine and hounds." President Adams' colorful language reflected the strength of his view — a view shared by his contemporaries — that the right to trial by jury protects our liberties every bit as much the right to cast votes for our representatives.

One of DOJ's own finally confirmed that the trial penalty is real. Assistant U.S. Attorney Aaron S. J. Zelinsky's opening remarks before the House Judiciary Committee sets out his argument that Roger Stone received preferential treatment because of his friendship with President Trump. In his remarks, AUSA Zelinsky admitted—shockingly, but something which all defense attorneys that proceed to trial have always suspected – that the DOJ has an official policy to impose a trial penalty:

> While the Guidelines have their supporters and detractors, the Department of Justice's official policy – which was reinforced and made more explicit in 2017 – is generally to recommend a sentence within the Guidelines range. Prosecutors are explicitly prohibited from seeking a below-Guidelines sentence without supervisory approval. For the Department to seek a sentence below the Guidelines in a case where the defendant went to trial and remained unrepentant is in my

experience unheard of – all the more so given Stone's conduct in the lead-up to the trial.

Interestingly, there was a time in this country when the so-called trial penalty was unconstitutional. Specifically, in *Walker v. Johnson*, the Supreme Court ruled that a defendant's guilty plea induced by the prosecutor's threat to seek a higher sentence was unconstitutional. *See* 312 U.S. 275, 279-86 (1941); *see also United States v. Jackson*, 390 U.S. 570, 572 (1968) (holding the federal kidnapping statute imposed "impermissible burden on the exercise of a constitutional right" because it called for the death penalty only for defendants convicted by a jury).

And not all judges are willing to impose a trial penalty. Particularly, in the case of *United States v. James Fields*, Judge Douglas Woodlock did not find it appropriate to impose a trial penalty. *See* Case No. 10-10388 (D. Mass. 2017) at [D.E. 260]. In that case, James Fields and Jon Latorella were charged with securities fraud, money laundering, and aggravated identity theft. The government offered defendants the same plea deal – five years. Latorella took the deal. Fields did not. Fields was convicted at trial. At sentencing, the prosecutor admitted that "[a]s to core culpability, there is nothing to distinguish Fields from Latorella." The government advocated for a sentence of 9 years – nearly twice the sentence offered to Latorella – due to Fields' vigorous defense and lack of remorse. Judge Woodlock disagreed and expressed discomfort with the prosecution's arguments stating:

[I]n my turn, do I say he went to trial, he consumed vast quantities of the Canadian forest with his paper in this context, consequently he gets a higher sentence? … [A]m I engaging in a pretext when I said it is not because he went to trial[,] it is because he lacked remorse …?

### a.    Inability to Cooperate

A trial penalty is even more concerning in situations as these where an individual cannot cooperate or cannot cooperate in a manner that is acceptable to the government.  These individuals are facing harsh sentences, but cannot meet the demands made of them by the government.  This is the situation that Claudia and Adrian faced, and they should not suffer a trial penalty as a result.

### VII.   Downward Departure

The Sentencing Guidelines were intended to define a "heartland" of typical cases to which guideline-specified sentences are to apply.  United States Sentencing Commission, Guidelines Manual, Ch. 1, Pt. A, Comment 4(b).  The Sentencing Reform Act of 1984 provides, however, that a court may depart from the guidelines if the court finds that "an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence different from that described."  18 U.S.C. § 3553(b). "The legislative history reflects that it was not Congress' aim to straitjacket a sentencing court, compelling it to impose sentences like a robot inside a guidelines' glass bubble, and preventing it from exercising discretion, flexibility or independent judgment."  *United States v. Lara*, 905 F.2d 599, 604 (2d Cir. 1990)

(relying on S.Rep. No. 225, 98th Cong., 2d Sess. 52, reprinted in 1984 U.S.C.C.A.N. 3182, 3235).  As the court stated in *United States v. Ferrouillett*, 1997 WL 266627 (E.D. La. 1997), "when a court finds an atypical case, one to which a guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted". (Quoting USSG Ch. 1, Pt. A, intro comment 4(b)).

Whether to depart downward and to what degree are decisions strictly within the trial court's discretion.  *See Koon v. United States*, 518 U.S. 81 (1996).

As the court in *Ferrouillett* described the downward departure analysis:

> A Court should ask what type of case a particular guideline is intended to cover.  Such an examination looks at the legislative history, the guideline commentary, prosecutorial practices, and changes in the types of crimes prosecuted in federal courts.
> . . .

Another aspect of a heartland analysis is a statistical profile of defendants prosecuted under the statute.  In essence, the guidelines represent the usual or ordinary case for which a departure is not appropriate.  1997 WL 266627 at *6-7 (citations omitted).

### a.   Claudia and Adrian's Extreme Family Situation Warrants a Departure

As noted *supra*, Claudia and Adrian have two young children.  David has already suffered the extortion and kidnapping in Madrid.  David and Jonathan suffered having their mother extradited and removed from their lives a year ago.  Six months later, their father was extradited and removed from their lives.

Communication between Claudia and Adrian and their children is difficult from the jail. There is an eight-hour time difference, which limits the times available to talk over the phone. Phone calls are very expensive and limited to 30 minutes at a time. This is not sufficient time to have any meaningful conversations. David and Jonathan are parentless. If Claudia and Adrian are sentenced according to the government's recommendation, these children, who are already in a vulnerable state, will grow up orphans.

David and Jonathan are residing in Madrid with Adrian's mother, but this is not a long-term solution. Adrian's mother is older and continues to suffer from the psychological effects of arrest and torture in Venezuela. She often suffers from debilitating panic attacks that render her unstable and unable to function. This is not a proper caretaker for two young children, but there are no other options. Claudia's mother is extremely ill and unable to care for herself. Claudia was her caretaker before she was extradited.

Having to live without both parents is simply unfair to innocent children whom life has already punished so severely at such a young age. *See e.g.*, *United States v. Aguirre*, 214 F.3d 1122 (9th Cir. 2000) (within district court's discretion to depart downward 4 levels for extraordinary family circumstances "based on the fact that there is an 8 year-old son who's lost a father and would be losing a mother for a substantial period of time"); *United States v. Dominguez*, 296 F.3d 192 (3rd Cir.

2002) (in bank fraud case, district court erred in holding it could not depart four levels downward for defendant who resided with her elderly parents, who were physically and financially dependent upon her where father had undergone brain surgery and had suffered a heart attack, was non-ambulatory, obese, incontinent, has significantly impaired mental ability, and experiences difficulty speaking, and where mother has severe arthritis and heart problems which prevented her from physically caring for her husband and, although she is seventy-five years old, is now forced to work to support him... circumstances were "truly tragic"); *United States v. Milikowsky*, 65 F.3d 4, 8 (2d Cir. 1995) ("Among the permissible justifications for downward departure ... is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties."); *United States v. Haversat*, 22 F.3d 790 (8th Cir. 1994) (in antitrust case where husband's care is critical to well-being of mentally ill wife, a downward departure was appropriate); *United States v. Sclamo*, 997 F.2d 970 (1st Cir. 1993) (affirmed downward departure from 24-30 month range to six months home detention for defendant who had been living with a divorced woman and her two children and had developed special relationship with woman's son that helped ameliorate son's serious psychological and behavioral problem, and son would regress if defendant incarcerated).

## VIII. Conclusion

For the reasons stated, the Court should impose a sentence in line with the type of sentence a Venezuelan court would impose for a similar violation.

### <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been filed via electronic mail with the Clerk of the Court by using CM/ECF System which will send a notice of electronic filing to all attorneys who have made an appearance on this 12th day of April, 2023.

By: *<u>/s/ Marissel Descalzo</u>*
Marissel Descalzo, Esq.